**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| HEADWATER RESEARCH LLC, | |
| *Plaintiff,* | Case No. 2:23-cv-00352-JRG-RSP |
| v. | JURY TRIAL DEMANDED |
| CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS AND VERIZON CORPORATE SERVICES GROUP INC., | |
| *Defendants.* | |
| HEADWATER RESEARCH LLC, | |
| Plaintiff, | Case No. 2:23-cv-00377-JRG-RSP |
| v. | (Member Case Under -379 Action) |
| T-MOBILE USA, INC. AND SPRINT CORP., | JURY TRIAL DEMANDED |
| *Defendants.* | |
| HEADWATER RESEARCH LLC, | |
| *Plaintiff,* | Case No. 2:23-cv-00379-JRG-RSP |
| v. | JURY TRIAL DEMANDED |
| T-MOBILE USA, INC. AND SPRINT CORP., | |
| *Defendants.* | |

**PLAINTIFF HEADWATER RESEARCH LLC'S**
**OPENING CLAIM CONSTRUCTION BRIEF**

\*   The parties agreed to consolidate claim construction proceedings (briefing and hearing) in the above-captioned cases. Thus, Headwater is filing this brief and supporting materials in the T-Mobile -379 case and will file this brief only in the Verizon -352 case.

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................... 1

II.     THE ASSERTED PATENTS ..................................................................................... 2

    A.      Overview of the '541 Patent ........................................................................... 2

    B.      Overview of the '042 Patent ........................................................................... 3

    C.      Overview of the '613 Patent ........................................................................... 5

    D.      Level of Ordinary Skill ................................................................................... 6

III.    DISPUTED TERMS FOR '541 PATENT ................................................................. 6

    A.      "one or more prospective . . . communications [over a wireless
        network]" ('541 patent, claim 1 and dependents) .......................................... 6

    B.      "service usage activity" ('541 patent, claim 1 and dependents) .................... 9

    C.      "background activity" ('541 patent, claim 1 and dependents) ...................... 12

IV.     DISPUTED TERMS FOR '042 PATENT ............................................................... 15

    A.      "device service state" ('042 patent, claim 1 and dependents) ...................... 15

    B.      "service policy setting" ('042 patent, claim 1 and dependents) .................... 19

    C.      "protected partition" ('042 patent, claim 1 and dependents) ........................ 21

V.      DISPUTED TERMS FOR '613 PATENT ............................................................... 23

    A.      "differential traffic control policy" ('613 patent, claim 1 and
        dependents) ................................................................................................... 23

    B.      "classify whether a particular application capable of both
        interacting with the user in a user interface foreground of the
        device, and at least some Internet service activities when not
        interacting with the user in the device user interface foreground, is
        interacting with the user in the device user interface foreground"
        ('613 patent, claim 1 and dependents) ......................................................... 24

    C.      "the user of the device is directly interacting with that application
        or perceiving any benefit from that application" ('613 patent, claim
        6) .................................................................................................................. 26

VI.     CONCLUSION........................................................................................................ 29

## TABLE OF AUTHORITIES

**Cases**

*Alexam, Inc. v. Best Buy Co.*,
  2012 WL 1188406 (E.D. Tex. Apr. 9, 2012) ................................................................ 17

*Epistar Corp. v. ITC*,
  566 F.3d 1321 (Fed. Cir. 2009) ................................................................................ 21

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
  381 F.3d 1352 (Fed. Cir. 2004) ................................................................................ 19

*JVW Enters., Inc. v. Interact Accessories*,
  424 F.3d 1324 (Fed. Cir. 2005) ................................................................................ 22

*Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*,
  22 F.4th 1369 (Fed. Cir. 2022) ........................................................................... 15, 16

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ................................................................................ 22

*Renishaw PLC v. Marposs Societa' per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998) ................................................................................ 17

*SanDisk Corp. v. Memorex Prods.*,
  415 F.3d 1278 (Fed. Cir. 2015) ................................................................................ 22

*SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys., Inc.*,
  242 F.3d 1337 (Fed. Cir. 2001) ................................................................................ 15

*Thorner v. Sony Comp. Ent. Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ........................................................................... 21, 23

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ........................................................................... 20, 24

**TABLE OF EXHIBITS**

| Ex.* | Description | Abbreviation |
|---|---|---|
| 1 | U.S. Patent No. 8,589,541 | '541 patent |
| 2 | U.S. Patent No. 9,198,042 | '042 patent |
| 3 | U.S. Patent No. 9,215,613 | '613 patent |
| 4 | T-Mobile's Patent Rule 4-2 Identification of Claim Constructions and Extrinsic Evidence, Ex. A (July 19, 2024) | T-Mobile CC Disclosure |
| 5 | Verizon's Patent Rule 4-2 Identification of Claim Constructions and Extrinsic Evidence, Ex. A (Aug. 6, 2024) | Verizon CC Disclosure |
| 6 | Declaration of Dr. Donald Turnbull for T-Mobile (Aug. 9, 2024) | Turnbull Decl.** |
| 7 | Declaration of Dr. Donald Turnbull for Verizon (Aug. 24, 2024) | |
| 8 | Declaration of Dr. Donald Turnbull for AT&T (Sept. 11, 2024) | |
| 9 | Deposition Transcript of Dr. Donald Turnbull (Aug. 30, 2024) | Turnbull Dep. |
| 10 | Defendants' Petition for *Inter Partes* Review of U.S. Patent No. 8,589,541, Paper 1, IPR2024-00942 (June 7, 2024) | '541 IPR Pet. |
| 11 | Defendants' Petition for *Inter Partes* Review of U.S. Patent No. 9,198,042, Paper 4, IPR2024-00809 (Apr. 19, 2024) | '042 IPR Pet. |
| 12 | Defendants' Petition for *Inter Partes* Review of U.S. Patent No. 9,215,613, Paper 1, IPR2024-00945 (June 7, 2024) | '613 IPR Pet. |
| 13 | Claim Construction Order, Dkt. 107, Case 2:22-cv-00422-JRG-RPS (E.D. Tex. Feb. 20, 2024) | -422 CC Order |

\* All exhibits attached to the concurrently filed declaration of James S. Tsuei

\*\* Dr. Turnbull submitted substantively identical declarations (Exs. 6–8) in the T-Mobile -377 and -379 cases, the Verizon -352 case, and the AT&T -397 and -398 cases. The parties have agreed that Dr. Turnbull's Aug. 30, 2024 deposition applies to all declarations and cases.

## I.      INTRODUCTION

Headwater and Defendants offer not just competing claim construction proposals but fundamentally different approaches to claim construction. The Federal Circuit has set forth straightforward rules to guide claim construction. For example, where claim terms have a plain meaning in the field, that meaning almost always controls. And where described embodiments are narrower than the claims, features of embodiments should not be imported into the claims unless the patentee evinces a clear intent to limit claim scope.

Defendants ask the Court to recharacterize and burden clear terms with artificial and extraneous baggage. Many of their proposals are inconsistent with embodiments taught in the specification. For other terms, Defendants' proposals are inconsistent with the claim language itself, as well as dependent claims. And across the board, Defendants' proposals lengthen and obfuscate the terms, making it harder for the jury to understand them.

Defendants' indefiniteness assertions fare no better. They fall far short of proving indefiniteness by clear and convincing evidence. The only "evidence" Defendants offer is a declaration by its expert, Dr. Turnbull. But even a cursory review of the declaration shows it is insufficient. The declaration is conclusory and replete with vague operations. Dr. Turnbull also made admissions in deposition that undermine his opinions.

For all terms, Defendants' constructions are inconsistent with its positions in IPRs. Defendants filed multiple IPRs on each of the asserted patents. In those IPRs, Defendants and its experts had no problem understanding the claims and mapping it to the prior art, including for the terms now alleged to be indefinite. Nor did Defendants propose to the PTAB the constructions it now advocates before this district court. Defendants' shifting-sands approach to claim construction is improper and provide further evidence that their constructions should be rejected.

## II.    THE ASSERTED PATENTS

The asserted claims in the captioned cases are U.S. Patent Nos. 8,589,541 ("'541 patent"), 9,198,042 ("'042 patent"), 9,215,613 ("'613 patent") and 8,924,543 ("'543 patent"). On October 8, 2024, pursuant to the parties' agreement, Headwater elected the following asserted claims:

- '541 patent — claims 41, 42, 45, 47, 55, 57, 79, 83, 120, 170

- '042 patent — claims 1, 3, 5, 6, 9, 13, 15

- '613 patent —claims 1, 8, 12, 15, 16, 18, 23

- '543 patent — claims 1, 8, 44, 47, 61, 88, 98, 120

The parties dispute the constructions of terms certain from the '541, '042, and '613 patents. The disputed terms generally appear in independent claim 1 of each patent are repeated in various dependent claims. Thus, Headwater's briefing focuses on claim 1 of each patent.

### A.    Overview of the '541 Patent

The '541 patent is titled "Device-assisted services for protecting network capacity" and issued on November 19, 2013 from U.S. Application No. 13/134,028, filed May 25, 2011. The '541 patent states: "[w]ith the advent of mass market digital communications, applications and content distribution, many access networks such as wireless networks, cable networks and Digital Subscriber Line (DSL) networks are pressed for user capacity." '541 patent at 1:34-37. In both wireless and "wire line" (wired connections) contexts, "user service consumption habits are trending toward very high bandwidth applications and content that can quickly consume the available capacity and degrade overall network service experience." *Id.* at 1:50–58.

Thus, the specification explains that "managing the wireless access connection capacity and network access connection resources is important to maintain network performance as network resources/capacity demand increases." *Id.* at 10:5–8. 35. The '541 patent notes that "if multiple

and/or all devices allow all applications to indiscriminately access or attempt to access network resources or transmit/receive traffic, then the network can generally become overloaded." *Id.* To address this problem, the '541 patent explains:

> What is needed is intelligent network monitoring to provide real-time traffic monitoring network service usage (e.g., at the packet level/layer, network stack application interface level/layer, and/or application level/layer) of the wireless network (e.g., radio access networks and/or core networks) and to effectively manage the network service usage for protecting network capacity (e.g., while still

> For example, intelligent network monitoring of the wireless network to effectively manage network service usage for protecting network capacity can include differentially controlling over the air software updates and/or performing software updates via wired connections only. As another example, intelligent network monitoring of the wireless network to effectively manage network service usage for protecting network capacity can include differentially controlling various applications that demand significant network resources or network capacity."

*Id.* at 16:38–17:5.

> Claim 1 of the '541 patent is representative for purposes of claim construction:

> 1. A non-transitory computer-readable storage medium storing machine-executable instructions that, when executed by one or more processors of a wireless end-user device, cause the one or more processors to:

> identify a service usage activity of the wireless end-user device, the service usage activity being associated with a first software component of a plurality of software components on the wireless end-user device, the service usage activity comprising one or more prospective or successful communications over a wireless network;

> determine whether the service usage activity comprises a background activity;

> determine at least an aspect of a policy based on a user input obtained through a user interface of the wireless end-user device or based on information from a network element, the policy to be applied if the service usage activity is the background activity, the policy at least for controlling the service usage activity;

> and if it is determined that the service usage activity is the background activity, apply the policy.

## B.     Overview of the '042 Patent

The '042 patent is titled "Security techniques for device assisted services," and issued on

November 24, 2015 from U.S. Appl. No. 13/737,748 filed on January 9, 2013. Like the '541 patent, the inventions of the '042 patent are presented in the context of increasing overall usage of network resources. The '042 patent is concerned with security on end-user devices—e.g., security to ensure that the service monitoring aspects described in the patent are protected from "unauthorized modifications to the particular service policy setting." '042 patent at Abstract. For example, as the patent explains: "In some embodiments, various secure execution environments for device assisted services are provided using various hardware partition techniques (e.g., secure memory, secure modems, secure memory partition(s) in the CPU/processor)." *Id.* at 3:4–-46. In other embodiments, security is improved through encryption. *E.g., id.* at 4:32-37 ("the service control link is a secure link (e.g., an encrypted communication link)", 11:25-30 ("For example, the DAS agents on the modem can be stored in an encrypted and signed format on non-volatile (NV) memory on the modem that is only accessible by the network service control link or by a local secure control link from the protected DAS partition to the modem execution partition.").

Claim 1 of the '042 patent is representative for purposes of claim construction:

1. A method comprising:

receiving, over a service control link, a report from a wireless end-user device, the report comprising information about a device service state;

determining, based on the report, that a particular service policy setting of the wireless end-user device needs to be modified, the particular service policy setting being stored in a protected partition of the wireless end-user device, the protected partition configured to deter or prevent unauthorized modifications to the particular service policy setting, the particular service policy setting being associated with a service profile that provides for access by the wireless end-user device to a network data service over a wireless access network, the particular service policy setting configured to assist in controlling one or more communications associated with the wireless end-user device over the wireless access network; and

is in response to determining that the particular service policy setting needs to be modified, sending configuration information to the wireless end-user device over the service control link, the configuration information configured to assist in modifying or allowing modifications to the particular service policy setting.

4

### C.      Overview of the '613 Patent

The '613 patent is titled "Wireless end-user device with differential traffic control policy list having limited user control," and it issued on December 15, 2015 from U.S. Application No. 14/685,511, filed April 13, 2015. The '613 patent shares a similar specification with the '541 patent and describes the same network resource consumption problems in the prior art as motivating the claimed inventions. *Compare, e.g.*, '541 patent, at 9:22-17:43, *with* '613 patent, at 2:61-11:15.

The '613 patent claims contain additional limitations beyond the '541 patent claims, including "an interface to allow a user to augment the differential traffic control policy for the first one or more applications but not for the second one or more applications and/or services," the requirement of both a WWAN modem and WLAN modem, and selective allowance or denial of an Internet service activity based on not only a differential traffic control policy but "any applicable user augmentation of the differential traffic control policy." *See* '613 patent, cl. 1.

Claim 1 of the '613 patent is representative for purposes of claim construction:

1. A wireless end-user device, comprising:

a wireless wide area network (WWAN) modem to communicate data for Internet service activities between the device and at least one WWAN, when configured for and connected to the WWAN;

a wireless local area network (WLAN) modem to communicate data for Internet service activities between the device and at least one WLAN, when configured for and connected to the WLAN;

a non-transient memory to store

a differential traffic control policy list distinguishing between a first one or more applications resident on the device and a second one or more applications and/or services resident on the device, and

a differential traffic control policy applicable to at least some Internet service activities by or on behalf of the first one or more applications;

an interface to allow a user to augment the differential traffic control policy for the first one or more applications but not for the second one or more applications and/or

services; and

one or more processors configured to

classify a wireless network to which the device currently connects in order to communicate data for Internet service activities as at least one of a plurality of network types that the device can connect with,

classify whether a particular application capable of both

interacting with the user in a user interface foreground of the device, and

at least some Internet service activities when not interacting with the user in the device user interface foreground,

is interacting with the user in the device user interface foreground, and

selectively allow or deny one or more Internet service activities by or on behalf of the particular application based on whether or not the particular application is one of the first one or more applications, the differential traffic control policy, including any applicable user augmentation of the differential traffic control policy, and the classifications performed by the one or more processors.

### D.    Level of Ordinary Skill

For the asserted patents, Defendants propose that a POSITA would have "at least a bachelor's degree in computer science, computer engineering, or a similar field, and approximately two years of industry or academic experience in a field related to computer software development and/or computer networking." Turnbull Decl. at ¶ 29. For purposes of claim construction, Headwater does not dispute this proposed level of ordinary skill.

## III.    DISPUTED TERMS FOR '541 PATENT

### A.    "one or more prospective . . . communications [over a wireless network]" ('541 patent, claim 1 and dependents)

| Headwater's Proposal | Defendants' Proposal |
|---|---|
| Not indefinite; plain and ordinary meaning | Indefinite |

Claim 1 of '541 patent recites identifying a service usage activity of the wireless end-user device, "the service usage activity comprising *one or more* **prospective** *or successful*

*communications over a wireless network*."[1] Defendants' indefiniteness argument focuses on the word "prospective." Within the quoted claim language, Defendants don't contend that "service usage activity" is indefinite. Nor do Defendants contend that "one or more successful communications over a wireless network" is indefinite. Rather, Defendants' entire argument is that "the prospective term is ambiguous" allegedly because "there is no indication as to what constitutes a 'prospective' communication 'over a wireless network.'" Turnbull Decl. at ¶ 51.

This fails. "Prospective" carries its plain meaning in ordinary English usage. In the context of the surrounding claim language, specification, and invention of the '541 patent, a "prospective" communication over a wireless network is simply a *potential* or *eligible* communication over a wireless network. This understanding follows from the declaration and deposition testimony of Defendants' own expert, Dr. Turnbull. In view of those opinions, the term is not indefinite.

As an initial matter, Dr. Turnbull does not contend that the term "service usage activity" is indefinite. Turnbull Dep. at 60:10–61:18 (no opinions that the preceding claim language "the service usage activity comprising . . ." is indefinite). Further, Dr. Turnbull affirmatively agrees that the term "one or more successful communications over a wireless network" is *definite*. He explains that in the context of the claims and specification of the '541 patent, the scope of a successful communication is "sufficiently clear" (Turnbull Decl. ¶¶ 52–53):

> This claim language establishes two possible types of a "service usage activity," namely either a "prospective communication over a wireless network," or a "successful communication over a wireless network." *In the context of claims and specification of the '541 Patent, the scope of a "successful communication over a wireless network" **is sufficiently clear to me***. The specification explains that "a network service usage activity is any activity by the device that includes wireless network communication." '541 Patent at 19:8–10. It goes without saying that the purpose of a wireless network communication is to have information in that *communication successfully travel over a wireless network to its intended*

---

[1] All emphasis added unless otherwise noted.

destination—*i.e. a "successful communication over a wireless network*."

Dr. Turnbull confirmed this understanding in deposition. He testified that "a successful communication over the wireless network" is clear and means "a communication that successfully travels over a wireless network." Turnbull Dep. at 62:8–64:3.

Given that a "successful" communication is one that successfully travels over a wireless network, a "prospective" communication is simply a communication that *potentially* travels (or is eligible to travel) over a wireless network. This matches the plain meaning of "prospective" in ordinary English usage. That meaning, as Dr. Turnbull testified, is "potential" or "eligible":

Q:    Have you heard of the word "prospective" before?

A:    Sure.

Q:    What does "prospective" mean?

A:    ***I guess it refers to something that is eligible. "Potential" maybe is more accurate***. Just generally ideas like that.

Turnbull Dep. at 64:3–20. Dr. Turnbull's testimony is consistent with general purpose dictionaries, which likewise define "prospective" as "potential." *See* https://www.dictionary.com/browse/prospective (*prospective*: "**potential**, likely, or expected: *a prospective partner*").

Indeed, understanding a prospective communication as a "potential" communication (that may not ultimately travel over the wireless network) is consistent with the claims, specification, and overall invention. The '541 patent is broadly directed to "differential" control of certain attempts by applications or services on a device to access a wireless network. *See* '541 patent at cl. 1, 16:45–57, 15:14–18; *see also* Turnbull Decl. ¶ 56. And, as Dr. Turnbull acknowledges: "The '541 Patent includes extensive disclosures regarding how particular 'service usage activities' may be initiated *but are subsequently 'block[ed],' 'throttled,' or otherwise not permitted to occur. E.g.* '541 Patent at 16:13–25; 19:38–58; 31:51–32:31." Turnbull Decl. at ¶ 58.

Thus, a fundamental concept of the '541 patent is that certain communications are permitted access to the wireless network, whereas other communications are, in some way, "not permitted to occur." *Id.*; *see also* '541 patent at cl. 42 (reciting "wherein control the first usage activity comprises prevent, restrict, or block the first service usage activity"). The claim language "prospective or successful communications" reflects this. The claimed "service usage activity" includes both (1) successful communications over a wireless network and (2) *potential* communications (e.g., communications that may not be "successful" depending on policy application). The term "prospective" clarifies the scope of claim 1 and is consistent with the objective and teachings of the '541 patent.

Defendants' indefiniteness assertion is also undermined by their IPR on the '541 patent. In that IPR, Defendants and their expert had no problem understanding the "prospective" term and mapping it to the Rao prior art reference. Defendants argued that "Rao's intercepting, inspecting, and/or storing packets in queues ***before*** communicating them from the queues discloses identifying one or more ***prospective*** communications." '541 IPR Pet. at 11 (emphasis in original). This is the same understanding of "prospective" as potential communications discussed here. Because the packets are formed in queues *before* they are transmitted over the network, and because certain packets may not be transmitted, Defendants say they are "prospective" communications.

### B.    "service usage activity" ('541 patent, claim 1 and dependents)

| Headwater's Proposal | Defendants' Proposal |
|---|---|
| No construction necessary; plain and ordinary meaning | "an activity by the first software component that requires usage of a wireless network connection" |

The term "service usage activity" comprises simple English words with readily understandable meanings to a POSITA and jury. It should be given its plain meaning. The claims make clear that "service usage activity" in claim 1 is both: (1) "*associated* with a first software

component of a plurality of software components on the wireless end-user device," and (2) "*compris[es] one or more prospective or successful communications over a wireless network*."

Defendants' proposal changes the claim scope in both ways. First, under Defendants' proposal, "service usage activity" is not simply "*associated* with a first software component" but instead must be—directly—"an activity ***by*** the first software component." Their proposal also transforms "service usage activity" from being something which "*compris[es]* one or more prospective or successful communications over a wireless network" into one which "***requires*** usage of a wireless network connection." Defendants' expert, Dr. Turnbull, offers no opinion or analysis to support this attempt to limit the claims. Nor do Defendants' intrinsic record citations establish a basis to do so, such as through lexicography or disclaimer.

At most, Defendants' citations show that *examples* of "network service usage activity" include activities that *may* utilize a network connection, and which (consistent with the claim language) *comprises* a wireless network communication. *See, e.g.*, '541 patent, at 19:8-10 ("In some embodiments, a network service usage activity is any activity by the device that *includes* wireless network communication."), 19:15-37 (listing examples of "network service usage activity"). And nowhere in the intrinsic record is there any support for Defendants' proposal that "service usage activity" be an "activity ***by*** the first software component." The record plainly does not evince the "clear and unmistakable" disclaimer Defendants would require to successfully narrow the claims beyond their plain and ordinary meaning.

The specification also discusses network usage activities which do not "***require***" a wireless network connection" but instead may be performed over a wireless ***or*** wired connection, which is itself discussed by the patentee as a criterion for applying network service policy on an activity. *See, e.g.*, '541 patent, at 33:47-55 ("In some embodiments, a QoS service control policy is adapted

10

as a function of the type of network the device is connected to. For example, the QoS traffic control policies and/or the *QoS service charging policies can be different when the device is connected to a wireless network [] than when the device is connected to a wired network []*).”); *see also id.* at 107:2-5 (“The techniques may be applicable to an applicable known or convenient (wired or wireless) device for which there is a motivation to control network service usage.”), 107:13-18 (“Wireless media are known to have more bandwidth constraints, which is why a wireless device is an expected use, though the technique may be applicable to wired devices in certain situations.”).

Defendants’ proposed construction should also be rejected because it is inconsistent with numerous dependent claims of the patent. For example, multiple dependent claims contradict Defendants’ proposal that “service usage activity” be an “activity *by* the first software component” rather than being simply “associated with” the first software component” as required in the claims.

First, several claims clearly separate “service usage activity” from “first software component” such that Defendants’ proposal (that the activity be “*by*” the first software component) must be incorrect. For example, claim 9 requires the “service usage activity results from cooperation between the first software component and at least one other software component, application, process, function, activity, or service.” Claim 16 provides that the “service usage activity results from cooperation between the first software component and a proxy function.” Such claims make clear that the “service usage activity” need not be an “activity *by* the first software component” but can be the *result* of cooperation between multiple software components in the claimed device. This is fully consistent with the claim’s explicit requirement that “service usage activity” be “*associated* with a first software component” and establishes that Defendants’ proposal improperly limits the claims.

Other dependent claims make clear that neither the “first software component” nor the

11

"service usage activity" are intended to be coextensive or overlapping (such that "service usage activity" be always "by" a first software component). For example, claims 28, 29, and 35 specify that the "policy" recited in claim 1 can be based on the "first software component" *or* the "service usage activity" (or a combination of both). Because Defendants contend "service usage activity" must be "an activity *by* the first software component," their proposal inserts both redundancy and ambiguity into these and similar dependent claims that require differentiation between "service usage activity" and "first software component."

Further still, other dependent claims provide that for a "second service usage activity" (to which the construction of "service usage activity" would apply) that need not be "an activity by the first software component" or even "associated with" the first software component at all. Claim 160 states that there is a "second service usage activity being associated with the first software component *or* with a second software component"—meaning that the claims contemplate a "service usage activity" (albeit a "second" one) that contradicts Defendants' proposal, which would rewrite claim 160 and similar claims.

In sum, the evidence shows that "service usage activity" has a plain and ordinary meaning that is elucidated by the claims themselves, and Defendants' proposed rewriting of the claims should be rejected as unsupported by and inconsistent with with the intrinsic record.

C.    **"background activity" ('541 patent, claim 1 and dependents)**

| Headwater's Proposal | Defendants' Proposal |
|---|---|
| Not indefinite; plain and ordinary meaning | Indefinite |

Claim 1 of the '541 patent recites determining "whether the service usage activity comprises a *background activity*." The term "background activity" is a known term in computer software and networking, and the '541 patent uses it in the ordinary sense. *See* Turnbull Dep. at

89:24–9:1 ("Q: Do you offer any opinion that ['background activity'] is not a term of art? A: *No*. Other than my discussion in trying to make sense of it in the claim, in the patent itself."). Indeed, according to Dr. Turnbull, "the fundamental purpose of the invention described in the '541 Patent [is] to prevent certain '*background activity*' from accessing a wireless network in certain instances." Turnbull Dec. ¶ 61. In addressing this purpose and proposing solutions, the '541 patent relies on the plain and ordinary meaning of "background activity" in the art. The patent doesn't seek to redefine the term—nor does Dr. Turnbull contend that it does. *See* Turnbull Dep. at 46:16–20 ("Q: For [the term 'background activity'] do you offer any opinions regarding lexicography or disclaimer? A: *Nothing that I see here. No.*").

Consistent with the term's plain meaning, the specification provides extensive disclosures about background activities. The specification explains that even when the user is not directly interacting with an application, the application *can be running in the background* and continuing to consume potentially significant network resources ('541 patent at 14:47–15:4):

> For example, the types of service activities and/or device behavior that can reduce network capacity and/or network resource availability include *software updates for OS and applications, frequent OS and application background network accesses and signaling, frequent network discovery and/or signaling* (e.g., EtherType messages, ARP messages, and/or other messaging related to network access), *cloud synchronization services, RSS feeds and/or other background information feeds, application (e.g., web browser) or device behavior reporting, background email downloads, content subscription service updates and downloads* (e.g., music/video downloads, news feeds, etc.), text/voice/video chat clients, virus updates, peer to peer networking applications, inefficient network access sequences during frequent power cycling or power save state cycling, large downloads or other high bandwidth accesses, and/or greedy application programs that continually and/or frequently access the network with small transmissions or requests for information. Various other examples will now be apparent to one of ordinary skill in the art.

The specification further describes a "background class," which is "generally used for lowest for lowest priority service usages (e.g., typically used for e-mail with and without downloads/attachments, application software updates, OS software updates, and/or other similar applications/

functions." *Id.* 23:1–5. The patent distinguishes this from higher priority classes, such as the "conversational class," "streaming class," and "interactive class." *Id.* at 22:50–67.

Dr. Turnbull acknowledges that the '541 patent specification "provides some differential between 'background' activities and other activities." Turnbull Decl. ¶ 72 (citing '541 patent at 23:1–5, 32:21–26, 18:39–55). But he never explains why these disclosures are insufficient. Nor does Dr. Turnbull articulate any genuine ambiguity as to "background activity." For example, he never asserts (much less explain) that a POSITA would be unable to determine whether certain service usage activities are "background activities"—because a POSITA can.

Instead, Dr. Turnbull makes vague observations that rest on factual and legal error. For example, he asserts that the specification provides limited explanation as to what constitutes a "foreground" activity. Turnbull Decl. ¶ 73. But he conceded that the term "foreground activity"— or the word "foreground"—does not appear in claim 1 of the '541 patent. *See* Turnbull Dep. at 92:1–93:1. Thus, it is unclear how his argument about "foreground" could render claim 1 indefinite. As another example, Dr. Turnbull asserts that claim 6 of the '613 patent "compound[s] the confusion." Turnbull Dep. at ¶ 74. But claim 6 does not even recite "background activity" or "background." Further, there is no legal basis that a dependent claim from a different patent could render claim 1 of the '541 patent indefinite. *See* Turnbull Dep. at 94:1597:25 ("Q: Have you ever heard of a claim being found indefinite because of a dependent claim of another patent? A: I just don't know the case law related to that.").

Defendants' indefiniteness assertion is also undermined by their IPR on the '541 patent. In that IPR, Defendants and their expert had no problem understanding the claim language and mapping it to the prior art. Indeed, the IPR petition asserts that "[d]etermining *whether an activity is a background activity was **well known***" and "the methodology for making that determination

would have been a simple design choice[.]" '541 IPR Pet. at 12–13. This further demonstrates that the term "background activity" is not indefinite.

## IV.    DISPUTED TERMS FOR '042 PATENT

### A.    "device service state" ('042 patent, claim 1 and dependents)

| Headwater's Proposal | Defendants' Proposal |
|---|---|
| No construction necessary; plain and ordinary meaning. | "information about the current status of the device required to adequately define the actions needed from the service controller to maintain proper device-assisted service (DAS) system operation" |

The term "device service state" is a plain English term which should be given its plain and ordinary meaning absent clear and unmistakable disclaimer. But there is no such disclaimer here. Defendants' proposal appears to be drawn from the following example in the specification:

> For example, the information reported from the device and received or derived outside the device that is required to adequately define the actions needed from the service controller to maintain proper DAS system operation is sometimes referred to herein as the "device service state."

'042 patent, at 18:6-11. Defendants' proposal thus appears to be based on the argument that the patentee specially defined "device service state" in the '042 patent. But: "The "standards for finding lexicography and disavowal are exacting. To act as its own lexicographer, a patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *SciMed Life Sys. Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1341 (Fed. Cir. 2001). The patentee did not do so here. The patent's passage at 18:6-11 not only describes an "*example*" in the specification, but it also provides that the potential definition is only "*sometimes*" referred to as "device service state."

The specification's usage of the phrase "sometimes referred to herein" is insufficient to convey lexicographical intent. *See, e.g.*, *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1377-81 (Fed. Cir. 2022). In *Kyocera*, the Federal Circuit found the term "driven

position" in the context of a mechanical driver (for fastening staples, nails, etc.) to be defined through the patentee's description—using "sometimes referred to herein" language—as the "bottom-most travel position" of the moving piston. *Id.* at 1378. This was because there existed only a "single position" that would be the "bottom-most travel position," and that the surrounding written description "suggest[ed] the 'driven position' must be a single position." *Id.* at 1379. But where the patentee in *Kyocera* used identical "sometimes referred to herein" language to describe other claim elements, the context of such discussion did not support finding lexicographical intent. *See id.* at 1380-81 (finding no lexicography for "lifter member" where patentee stated aspects of embodiments were "sometimes referred to herein as a lifter member").

Unlike in *Kyocera*, neither the term "device service state" nor its alleged definition at '042 patent, at 18:6-11 appear in a context where lexicographical intent can be properly found. In *Kyocera*, the Federal Circuit emphasized the patentee's statements: "Nothing about this statement suggests the 'bottom position' is merely an example of a driven position." *Kyocera*, 22 F.4th at 1378. In contrast, the '042 patent's alleged definitional statement from 18:6-11 is clearly described as an "***example***." Application of lexicographical intent in *Kyocera* to "driven position" was appropriate also because the specification suggested there could be only a "single" position for the piston, and the lexicographical definition in from the patentee ("bottom-most travel position") satisfied that understanding. But the '042 patent's "device service state" term is not one which can readily be reduced to an exemplary description in the specification, unlike in the mechanical arts context presented in *Kyocera*.

Defendants' proposal is problematic in multiple other respects. *First*, Defendants' proposal does not faithfully apply the alleged definition it cites in the specification. The '042 patent states that "device service state" is sometimes referred to as "the information reported from the device

16

*and received or derived outside the device* that is required to adequately define the actions needed from the service controller to maintain proper DAS system operation." '042 patent, at 18:6-11 (emphasis added). To the extent the passage from 18:6-11 is arguably lexicographical, Defendants' proposal excises the "*and received or derived outside the device*" language without any explanation or justification.

*Second,* Defendants' proposal improperly injects the term "device-assisted service (DAS)" into claim 1. But where the patentee intended to invoke the phrase "device-assisted service (DAS)" to claim certain patent scope, it did so explicitly, such as in claim 14: "wherein the device service state comprises a service profile setting, a service usage policy setting, or a device-assisted services (DAS) setting."

*Third*, Defendants' proposal adds unnecessary ambiguity into the claims. "The purpose of claim construction is to clarify ambiguities, not to simply rewrite the claims using different words." *Alexam, Inc. v. Best Buy Co.*, 2012 WL 1188406, at *18 (E.D. Tex. Apr. 9, 2012). "[S]traightforward claim language language [which] presents no ambiguity" should not be replaced with "a more complicated phrase." *Id.* Yet, under Defendants' proposal for "device service state," a juror would need to determine what amount and kind of information is "*required*" to "*adequately define* the actions needed from the service controller." And their proposal charges the jury with determining what is a "*proper*" DAS system operation. This is an imprecise construction not suitable for lexicographical application. *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998) ("patentee's lexicography must, of course, appear 'with reasonable clarity, deliberateness, and precision' before it can affect the claim").

Defendants' proposal presents additional difficulties not easily resolved by a juror. Dependent claims 14-17 impose further limitations on the "device service state" of claim 1. For

example, claim 14 provides that "the device service state comprises a service profile setting, a service usage policy setting, or a device-assisted services (DAS) setting," and claim 17 provides that "the device service state comprises an agent report, a service usage record, a transaction record, or an integrity report." '042 patent at cls. 14, 17. The jury would be required to consider whether such dependent claim limitations on "device service state" are information that is "*required*" to "*adequately define* the actions needed from the service controller" for "*proper*" DAS system operation, where no such exercise is needed under the term's plain meaning.

*Fourth*, Defendant's proposal results in confusing redundancy, which is illustrated by substituting its proposed construction into the claims.

| Claim 1 [excerpt] | Claim 1 [excerpt with Defendants' claim construction proposal] |
|---|---|
| 1. A method comprising: receiving, over a service control link, a report from a wireless end-user device, the report comprising information about a device service state; | 1. A method comprising: receiving, over a service control link, a report from a wireless end-user device, the report comprising information about a [*information about the current status of the device required to adequately define the actions needed from the service controller to maintain proper device-assisted service (DAS) system operation*]; |

As shown here, plugging in Defendants' proposed construction results in the claim requiring a "report from a wireless end-user device" where the report comprises "information about a [*information about the current status of the device…*]." This "information about information" redundancy is not simply an issue of grammar easily overlooked by a juror. Though the confusion could potentially be resolved by further rewriting the claims to read: "the report comprising [*information about the current status of the device…*]" (i.e., to delete out the "information about" language from claim 1), this only illustrates why the proposal is unworkable.

In short, Defendants have not shown for "device service state" enough evidence to overcome the "'heavy presumption' that claim terms 'carry their accustomed meaning in the

18

relevant community at the relevant time.'" *Home Diagnostics, Inc. v. LifeScan, Inc*., 381 F.3d 1352, 1355 (Fed. Cir. 2004) (citation omitted). Defendants' proposal injects ambiguity and imprecision in the claims where none currently exists. "Device service state" should thus be given its plain and ordinary meaning.

**B.** **"service policy setting" ('042 patent, claim 1 and dependents)**

| Headwater's Proposal | Defendants' Proposal |
|---|---|
| "policy setting for a network data service" | "rule for governing network service usage that can be implemented on the device" |

The term "service policy setting" should be construed as "policy setting for a network data service." Headwater's proposed construction is consistent with the intrinsic evidence, whereas Defendants' proposal would only introduce ambiguity.

Headwater's proposal simply makes clear that the "service" referred to in the phrase "service policy setting" is a network data service. This is consistent with the intrinsic evidence. For example, the claim language demonstrates that the "service policy setting" is a setting that relates to network data services (e.g., access to a cellular data network provided by a cellular carrier). *See, e.g.*, '042 patent at cl. 1 ("determining, based on the report, that a particular service policy setting of the wireless end-user device needs to be modified . . . the particular service policy setting being associated with a service profile that provides for access by the wireless end-user device to a network data service over a wireless access network, the particular service policy setting configured to assist in controlling one or more communications associated with the wireless end-user device over the wireless access network"). This is also consistent with the specification's teachings. *See, e.g.*, '042 patent at 8:26-30 ("a policy control server 154 stores policy settings for the various service plans that can be implemented on the device, and communicates the appropriate policy settings the appropriate device DAS agents").

Defendants' proposed construction would not clarify the claim language but would instead inject confusion. For example, it is unclear why Defendants seek to replace "policy setting" with "rule"—nor is it clear what Defendants mean for a rule to be implemented "on the device." Notably, dependent claim 2 includes the word "implementing" but doesn't indicate anything about where the service policy setting must be implemented. *See* '042 patent at cl. 2 ("wherein the particular service policy setting assists in implementing a roaming control, a parental control, or an enterprise wireless wide-area network (WWAN) management control").

Defendants' construction is also potentially confusing in its use of "***can*** be implemented on the device," making unclear whether this is even a limitation on the claim and, if so, exactly what that limitation requires. And it is unclear what Defendants seek to accomplish in their proposal of "for governing network service usage." Claim 1 already specifies that the service policy setting is "configured to assist in controlling one or more communications associate with the wireless end-user device over the wireless access network." '042 patent at cl. 1. It is unclear what Defendants believe "governing" means and, if it means the same thing as "controlling," why this portion of Defendants' construction would not be redundant with the remainder of claim 1.

Defendants' PR 4-3 disclosure also identifies three sources of extrinsic evidence that allegedly support Defendants' construction. *See* Dkt. 78-1 (JCCS) at 3-4. But Defendants don't identify any particular disclosure in these sources as relevant to the disputed term here, despite the sources spanning 408, 8, and 19 pages, respectively. Nor is Defendants' proposed construction found in any of these sources. Because the intrinsic record is sufficiently clear already, there is no need for this Court to resort to Defendants' extrinsic evidence in any event. *See Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1583 (Fed. Cir. 1996).

The term "service policy setting" does not require the rewriting that Defendants propose.

Headwater's much simpler proposal simply clarifies that the recited "service" refers to a network data service, which would provide ample clarity to the jury. There is no reason for any further construction beyond that, and Defendants' proposal only introduces ambiguity.

### C.      "protected partition" ('042 patent, claim 1 and dependents)

| Headwater's Proposal | Defendants' Proposal |
|---|---|
| No construction necessary; plain and ordinary meaning. | "a secure device assisted service execution environment" |

The term "protected partition" is a simple, two-word phrase that would be readily understood by a POSITA and jury. Defendants' proposed rewriting seeks to narrow all claims of the '042 patent without any legal basis for doing so.

There is a "heavy presumption" that claim terms carry their "full ordinary and customary meaning, unless [the accused infringer] can show the patentee expressly relinquished claim scope." *Epistar Corp. v. ITC*, 566 F.3d 1321, 1334 (Fed. Cir. 2009). There are "only two exceptions" to the general rule that claim terms are given their full ordinary and customary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Comp. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Defendants' PR 4-3 disclosure of supporting evidence does not identify any portion of the file history as relevant, and none of Defendants' specification excerpts could even arguably constitute lexicography. Defendants have no basis for departing from the full plain and ordinary meaning and notably did not seek any construction of this term in their IPR petition. *See* '042 IPR Pet. at 7.

Especially when considered in the context of surrounding claim language, the scope and meaning of "protected partition" is already clear. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("the claims themselves provide substantial guidance as to the meaning of []

terms"). For example, claim 1 already makes clear that "the particular service policy setting [is] stored in a protected partition of the wireless end-user device" and "the protected partition [is] configured to deter or prevent unauthorized modifications to the particular service policy setting." '042 patent at cl. 1. Construction of this simple term is unnecessary.

Defendants' proposal does nothing to simplify this term for the jury in adding the phrase "device assisted service execution environment." Injecting this language is also improper because where the patentee intended to limit the claims with "device assisted service" language, it did so explicitly. *See, e.g.*, '042 patent at cl. 14 ("wherein the device service state comprises a service profile setting, a service usage policy setting, or a device-assisted services (DAS) setting").

Defendants seek to limit the claims to exemplary embodiments in the specification, apparently to exclude others. This is legal error. *See, e.g.*, *JVW Enters., Inc. v. Interact Accessories*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) (without a clear indication that the claims and disclosed embodiments are to be "strictly coextensive," courts "do not import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment."); *SanDisk Corp. v. Memorex Prods.*, 415 F.3d 1278, 1285-86 (Fed. Cir. 2015) (constructions that exclude embodiments are "rarely, if ever, correct"). For example, the specification uses the phrase "protected DAS [device assisted service(s)] partition" in several places and refers to "service execution environment" or "DAS execution environments" in other places. *See, e.g.*, 6:23-12:44, 14:62-15:1, 8:47-9:3. But these disclosures consistently are framed as being applicable to "some embodiments" of the disclosed inventions. None amounts to lexicography or any other limiter on the plain meaning of "protected partition" in claim 1. Defendants are simply attempting to import language from the specification into the claims.

Because "protected partition" already has a clear plain meaning and there is no legal basis to depart from that plain meaning and narrow the claim, construction of this term is unnecessary.

## V.    DISPUTED TERMS FOR '613 PATENT

### A.    "differential traffic control policy" ('613 patent, claim 1 and dependents)

| Headwater's Proposal | Defendants' Proposal |
|---|---|
| No construction necessary; plain and ordinary meaning | "rules for controlling network traffic that distinguishes between two or more things" |

The term "differential traffic control policy" does not require construction. Especially when read in the context of its surrounding claim language, this term already has a clear, plain meaning. For example, claim 1 recites in relevant part:

> a *differential traffic control policy* list distinguishing between a first one or more applications resident on the device and a second one or more applications and/or services resident on the device, and

> a *differential traffic control policy* applicable to at least some Internet service activities by or on behalf of the first one or more applications

'613 patent at cl. 1. It is apparent from the claim language that the differential traffic control policy list distinguishes between applications and/or services, and the differential traffic control policy applies to Internet service activities. That is readily understandable to a POSITA and jury. And it is unclear why Defendants believe their proposed inclusion of "distinguishes between two or more things" would not be redundant of the claim's existing recitation of distinguishing between applications and/or services, unless they intend for "things" to refer to something else.

Nor is there any legal basis for departing from the plain meaning of this term. As with the prior term, Defendants' PR 4-3 disclosure of supporting evidence doesn't identify any portion of the file history as relevant, and none of Defendants' specification excerpts come close to lexicography. *See Thorner*, 669 F.3d at 1365 (recognizing that lexicography and disclaimer are the "only two exceptions" to the general rule that a term's plain meaning governs). Tellingly,

Defendants didn't seek construction of this term in their IPR petition. *See* '613 IPR Pet. at 3.

Defendants' PR 4-3 disclosure also identifies three sources of extrinsic evidence that allegedly support their construction. *See* Dkt. 78-1 (JCCS) at 5-6. But Defendants don't identify any particular disclosure in these sources as relevant to the disputed term here, despite the sources spanning 408, 8, and 19 pages, respectively. Nor is Defendants' proposed construction found in any of these sources. Because the intrinsic record is sufficiently clear already, there is no need for this Court to resort to Defendants' extrinsic evidence in any event. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

Because "differential traffic control policy" already has a clear plain meaning and there is no legal basis to depart from it and narrow the claim, construction of this term is unnecessary.

**B.    "classify whether a particular application capable of both interacting with the user in a user interface foreground of the device, and at least some Internet service activities when not interacting with the user in the device user interface foreground,  is  interacting  with  the  user  in  the  device  user  interface foreground" ('613 patent, claim 1 and dependents)**

| Headwater's Proposal | Defendants' Proposal |
|---|---|
| Not indefinite; plain and ordinary meaning | Indefinite |

This term can be divided into two parts. The middle portion of the term is a noun. It describes "a particular application" that is "capable of both interacting with the user in a user interface foreground of the device, and at least some Internet service activities when not interacting with the user in the device user interface foreground." The remainder of the term is a verb. It describes "classify[ing] whether" that application "is interacting with the user in the device user foreground." Defendants fail to show that either part of the term is indefinite.

As to the noun part ("a particular application . . ."), both the claims and specification provide substantial guidance. The specification describes applications that can significantly tie up

network resources, including, for example, "conference meeting services, video streaming, content update, software update, and/or other or similar application behavior." '641 patent at 8:15–18. The specification then states: "even when the user is not directly interacting with or benefiting from *this type of application*, the application can be running in the background and continuing to consume potentially significant network resources." *Id.* at 8:18–22. It then provides examples, such as "software updates" and "background email downloads," of such activities. *Id.* 8:23-45. This illustrates that many applications are capable of background Internet service activities (*e.g.,* a "software update") even when not interacting with the user in the device user interface foreground. A POSITA would readily understand which applications meet the claim.

Defendants cannot credibly dispute that the specification provides clear descriptions of applications that can interact with the user and that are also capable of Internet activity even when not interacting with the user. Further, the Court recently considered the same specification disclosure in construing a dependent claim of a related Headwater patent with similar language. -422 CC Order at 10 (citing '701 patent at 8:4-56). The Court noted that "the cited portion of the specification provides a clear description of what would be considered background in the foreground/background determination" and "background downloads such as emails, messages, or music would fall into the background activity category[.]" *Id.*

Based on the claim language, and the guidance and examples of the specification, the term "a particular application capable of . . ." is not indefinite. Despite repeated questions, Dr. Turnbull could not give a straight answer or explain why a POSITA would be unable to understand this. *See* Turnbull 114:20–119:5. Dr. Turnbull's evasive and non-responsive testimony spanning five pages of transcript is improper and warrants striking his opinions.

In any event, Defendants' IPR petition on the '613 patent confirms that an "application

capable of . . ." In the IPR, Defendants and their experts had no problem understanding the claimed application and mapping it to the prior art. *See* '613 Pet. at 26–27 (arguing that the Rao and Freund references disclose applications that are "capable of interacting with the user in the foreground" and are "also capable of internet service activities (e.g., sending and receiving network packets) when not interacting in the device display with the user").

As to the verb part of the term ("classify whether a particular application . . . is interacting with the user in the device user interface foreground"), there is likewise no evidence that the verb is indefinite. The classification is discussed in the specification. *See* '613 patent at Fig. 27, 101:16–39. And Dr. Turnbull provides no evidence or explanation that a POSITA would be unable to ascertain the scope of this term with reasonable certainty. Again, Defendants' IPR on the '613 patent undermines their assertion. In the IPR, Defendants and their experts had no problem arguing that the prior taught teaches the claimed classification. *See* '613 Pet. at 27 ("Both Rao and Freund teach that it is advantageous to classify whether a particular application (and its associated internet use) is interacting with the user in the device interface foreground.").

**C.**  **"the user of the device is directly interacting with that application or perceiving any benefit from that application" ('613 patent, claim 6)**

| Headwater's Proposal | Defendants' Proposal |
|---|---|
| Not indefinite; plain and ordinary meaning | Indefinite |

This term has a plain meaning and requires no construction. The Court recently considered the same or nearly identical claim language of dependent claim 6 of the '613 patent in construing various dependent claims of related Headwater patents that also recite the "directly interacting with that application or perceiving any benefit from that application" language. -422 CC Order (construing claim 2 of U.S. Patent No. 9,137,701, as well as claim 2 of U.S. Patent No. 9,271,184).

The Court should reject the indefiniteness argument here for the same reasons and based

on the same specification disclosures that the Court relied upon in rejecting the indefiniteness argument in the -422 case. *Id*. at 8-11 (citing '701 patent at 8:4-56). The same disclosure appears in the '613 patent at 8:4-56 and confirms that this term is not subjective and is sufficiently definite. Indeed, based on the same disclosures, the Court found that claim language like that appearing in claim 6 here "is not subjective and is sufficiently definite." *Id.* at 8. The Court noted that "the cited portion of the specification provides a clear description of what would be considered background in the foreground/background determination under the 'directly interacting with' and 'perceiving any benefit' inquiry" and "[i]n particular, the specification provides that background downloads such as emails, messages, or music would fall into the background activity category under the 'directly interacting with' and 'perceiving any benefit' inquiry. This cabins what a POSITA would understand 'benefit' to cover." *Id.*

Further, the independent claim provides clear context for the dependent claim and confirms that claim 6 is not subjective. The independent claim requires classifying whether an application is interacting with the user or is not interacting with the user. The dependent claim further specifies that what would be considered "interacting with the user" includes both when the user is "directly interacting with" the application and when the user is "perceiving any benefit" from the application. As the Court previously noted, this context "guides a POSITA's understanding of the inquiry away from a question of preference and towards a question of use." -422 CC Order at 10.. And the use of "'perceive' focuses a POSITA's understanding of 'benefit' to what is actively perceptible by the user rather than unnoticeable processes. This is distinct from determining if an application is providing a benefit to the user as Defendant's indefiniteness argument effectively requires. In other words, the emphasis of that phrase is on 'perceiving' whatever the 'benefits' of the application may be, rather than on whether the user perceives the operation *as* beneficial." *Id.*

It is clear in light of the specification at 8:4-42 that the claim language is not asking what is beneficial in an abstract sense, but whether the application is engaging in an imperceptible process such that the user is not actively perceiving any benefit from the application. *Id.*

Dr. Turnbull's indefiniteness opinions for this term are entirely conclusory and insufficient. His primary argument is that claim 6 allegedly "relies on a user's subjective experience." Turnbull Decl. at ¶ 82. This assertion is part of two paragraphs of vague observations that lack any supporting evidence. The assertion is also wrong and was refuted by the Court's findings discussed above. Dr. Turnbull failed to address these findings in either his declaration or deposition. At his deposition, Dr. Turnbull testified that he reviewed the -422 CC Order because he was asked to by counsel. *See* Turnbull Dep. at 30:3–31:7 (reviewed the order "relatively recently" in preparing for the deposition), 105:10–11 ("Q: You were asked by counsel to look at it? A: Yeah.").

When questioned about the order, Dr. Turnbull's only purported distinction was that Samsung declined to submit an expert declaration. *Id.* at 102:5–31. Dr. Turnbull did not—and could not—identify any other disagreements with the Court's findings or reasoning. *See id.* at 103:14:–21 ("Q: were there disagreements with Judge Payne's order that you had or his findings or reasoning? A: I don't think I Have anything else to say that I already haven't. Again, the lack of an expert . . . ."), 129:10–17 ("Q: . . . is there anything that you want to say about [the -422 CC Order]? A: I don't think I have anything to add beyond what I've already said.").

Dr. Turnbull's deposition occurred on August 30, 2024. And about two weeks later (on September 11, 2024), Dr. Turnbull submitted another declaration in the AT&T case asserting indefiniteness of claim 6 based on the same arguments. Again, his September 11 declaration failed to address or even mention the Court's findings and analysis in the -422 CC Order. This confirms that Dr. Turnbull has no substantive response and claim 6 is not indefinite.

28

## VI.    CONCLUSION

For the foregoing reasons, the Court should (a) reject Defendants' indefiniteness assertions and projected constructions, and (b) adopt Headwater's proposed constructions.

Dated: October 8, 2024                                        Respectfully submitted,

                                                              */s/ Marc Fenster*
                                                              _____
                                                              Marc Fenster
                                                              CA State Bar No. 181067
                                                              mfenster@raklaw.com
                                                              Reza Mirzaie
                                                              CA State Bar No. 246953
                                                              rmirzaie@raklaw.com
                                                              Brian Ledahl
                                                              CA State Bar No. 186579
                                                              bledahl@raklaw.com
                                                              Ben Wang
                                                              CA State Bar No. 228712
                                                              bwang@raklaw.com
                                                              Dale Chang
                                                              CA State Bar No. 248657
                                                              dchang@raklaw.com
                                                              Paul Kroeger
                                                              CA State Bar No. 229074
                                                              pkroeger@raklaw.com
                                                              Neil A. Rubin
                                                              CA State Bar No. 250761
                                                              nrubin@raklaw.com
                                                              Kristopher Davis
                                                              CA State Bar No. 329627
                                                              kdavis@raklaw.com
                                                              James S. Tsuei
                                                              CA State Bar No. 285530
                                                              jtsuei@raklaw.com
                                                              Philip Wang
                                                              CA State Bar No. 262239
                                                              pwang@raklaw.com
                                                              Amy Hayden
                                                              CA State Bar No. 287026
                                                              ahayden@raklaw.com
                                                              Jason M. Wietholter
                                                              CA State Bar No. 337139

jwietholter@raklaw.com
RUSS AUGUST & KABAT
12424 Wilshire Blvd. 12th Fl.
Los Angeles, CA 90025
Telephone: 310-826-7474

Andrea L. Fair
MILLER FAIR HENRY PLLC
1507 Bill Owens Parkway
Longview, Texas 75604
Telephone: 903-757-6400
andrea@millerfairhenry.com

***Attorneys for Plaintiff***
***Headwater Research LLC***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that counsel of record who to have consented to electronic service are being

served on October 8, 2024, with a copy of this document via the Court's CM/ECF system.

*/s/ Marc Fenster*
Marc Fenster