IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| HEADWATER RESEARCH LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| VERIZON COMMUNICATIONS INC., | § | Case No. 2:23-cv-00352-JRG-RSP |
| CELLCO PARTNERSHIP d/b/a VERIZON | § | |
| WIRELESS, and VERIZON CORPORATE | § | |
| SERVICES GROUP, INC., | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM ORDER

Before the Court is the Daubert Motion and Motion to Strike Opinions and Testimony of Plaintiff's Expert Coleman Bazelon, filed by filed by Defendants Verizon Communications Inc., Cellco Partnership d/b/a Verizon Wireless, and Verizon Corporate Services Group, Inc.. **Dkt. No. 186**. For the reasons discussed below, the Motion is **DENIED**.

## I. APPLICABLE LAW

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 requires a district court to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied with regard to a particular expert's proposed testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). District courts are accorded broad discretion in making Rule 702 determinations of admissibility. *Kumho Tire*, 526 U.S. at 152 ("the trial judge must have

considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"). Although the Fifth Circuit and other courts have identified various factors that the district court may consider in determining whether an expert's testimony should be admitted, the nature of the factors that are appropriate for the court to consider is dictated by the ultimate inquiry—whether the expert's testimony is sufficiently reliable and relevant to be helpful to the finder of fact and thus to warrant admission at trial. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

Importantly, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury's consideration. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391-92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir. 2002) ("'[t]he trial court's role as gatekeeper [under Daubert] is not intended to serve as a replacement for the adversary system.' . . . Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits," quoting Fed. R. Evid. 702 advisory committee note). As the Supreme Court explained in *Daubert*, 509 U.S. at 596, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *See Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

## II.    ANALYSIS

Defendants raise a number of issues with Plaintiff's damages expert, Dr. Bazelon, including that he relies on unreliable technical opinions from other experts as inputs, that he improperly utilizes the Entire Market Value Rule, that his spectrum-based valuation opinions are methodologically flawed, and that he makes unsupported assumptions about Defendants' network. *See* Dkt. No. 186 at 1. The Court will take up each issue in turn.

### A.  Inputs to Analysis

In the Motion, Defendants argue that "Dr. Bazelon's valuation of the spectrum allegedly saved through use of the accused features accepts, without independent verification, the validity of Dr. Wesel's calculation of data savings." *Id.* at 4.

Because the Court has already resolved that Dr. Wesel's opinions on this point are sufficiently reliable, there is no issue with Dr. Bazelon relying on them as he did. Accordingly, the Motion to Strike on this basis is **DENIED**.

### B.  Entire Market Value Rule[1]

In the Motion, Defendants argue that Dr. Bazelon's valuation of Verizon's spectrum holdings should be excluded because "when paired with Mr. Bergman's report, Dr. Bazelon's valuation of Verizon's spectrum violates the entire market value rule." *Id.* Specifically, Defendants assert that "[i]nstead of beginning with the smallest saleable patent practicing unit ("SSPPU"), which Headwater has identified as the devices allegedly practicing the asserted patents, Dr. Bazelon and Mr. Bergman start with the entirety of Verizon's spectrum holdings." *Id.* at 4-5 (citing *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014) ("reliance on the entire market value of the accused products ... 'cannot but help skew the damages horizon for the jury.'").

---

[1] ("EMVR").

The particular figures that Defendants take issue with are as follows:

- the wireless telecommunications industry generated $210 billion in revenues in 2023, with Verizon generating $77 billion in revenue;

- the wireless telecommunications infrastructure and network equipment industry had a combined annual revenue of about $39 billion in 2024;

- user-equipment revenues of smartphone sales were forecasted to be over $109 billion in 2024 and were over $102 billion in 2023;

- total revenues generated by FCC auctions, including the more than $41 billion generated by Auction 97;

- total costs associated with secondary market sales of spectrum ($3.5 billion, $1 billion, $2.7 billion); and

- the total value of Verizon's spectrum holdings, at $155 billion, the total saved spectrum due to the '541 Patent, and the total saved spectrum due to the '613 Patent.

*Id.* at 6 (citing Dkt. No. 186-2 (Dr. Bazelon's report)).

Defendants argue that presentation to the jury of such large numbers coming from the entirety of Verizon's spectrum holdings will inevitably cause this 'skewing of the damages horizon.' *Id.* at 5-6 Because of the prejudicial effect of such large numbers, Defendants contend that "even if Dr. Bazelon appropriately apportions the entirety of Verizon's spectrum holdings down to only a portion of the spectrum allegedly associated with infringement of the asserted patents (he does not), his baseline calculation should be excluded." *Id.* at 6 (citing *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67-68 (Fed. Cir. 2012) (barring the use of too high a royalty base, even if mathematically offset by a low enough royalty rate, because such a base carries a considerable risk of misleading a jury into overcompensating, stating that such a base

cannot help but skew the damages horizon for the jury and make a patentee's proffered damages amount appear modest by comparison)).

In response, Plaintiff argues that Defendants' assertions are misplaced because, even though Dr. Bazelon references the value of Verizon's spectrum portfolio in applying his capacity savings, he is not using this as his royalty base, which might trigger EMVR concerns. Dkt. No. 216 at 12. Plaintiff argues that Dr. Bazelon's model is not based on the total revenues or price of accused devices *per se*, nor is it based on the total Defendants spent on spectrum or on capital improvements of its network. *Id.* Instead, Dr. Bazelon looks to the incremental cost savings Defendants directly receive as a result of the data savings resulting from Defendants' sales of devices that include the accused features. *Id.* (citing *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1377 (Fed. Cir. 2017)). As to the large dollar figures, Plaintiff asserts that none are direct inputs into the calculation of a reasonable royalty, and that Plaintiff "can therefore agree not to present the figures relating to aggregate auction returns or carrier spending in general to the jury." *Id.* at 13. However, Plaintiff contends that "the dollar amounts of specific spectrum auctions are directly relevant to Dr. Bazelon's calculations of spectrum value" and that, therefore, these should not be excluded. *Id.* (citing *Finesse Wireless LLC v. AT&T Mobility LLC*, No. 2:21-CV-00316-JRG, 2023 WL 5612448, at *4 (E.D. Tex. Aug. 30, 2023)).

The EMVR "allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for customer demand." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009). That being said, the Court is satisfied that Dr. Bazelon's analysis does not invoke the EMVR. A plaintiff is permitted to present a damages theory based on avoided costs (*See Prism*, 849 F.3d 1360, at 1376-77), which

is what Dr. Bazelon does here (*See generally* Dkt. No. 186-2). Accordingly, the Motion to Strike on this basis is **DENIED**.[2]

### C. Valuation of Spectrum

In the Motion, Defendants argue that Dr. Bazelon's valuation of spectrum is unreliable. Dkt. No. 186 at 7. Specifically, they assert that the prices Defendant paid at spectrum auctions are an inappropriate way to value Defendants' spectrum holdings because the prices at those auctions can be driven by multiple factors such as "the fact that spectrum auctions only happen at times set by the FCC, and are not ongoing, paired with the necessity for future network planning, influences the price that carriers are willing to pay for the spectrum." *Id.* This, they contend, makes the auction prices an inappropriate proxy for the total value of a company's spectrum holdings. *Id.*

They further assert that Dr. Bazelon cherry-picked a single auction and then opined that the valuation of all of Defendants' low-band spectrum should be based on that single auction. *Id.* at 8. They contend this is inappropriate because the auction in question, Auction 97, was subject to a number of externalities which caused the prices there to be higher than normal. *Id.* at 8-11.

In response, Plaintiff argues that wireless carriers invest billions of dollars to increase network capacity, and one of the primary means by which they do so is through the acquisition of additional spectrum. Dkt. No. 216 at 2-3. Because Dr. Bazelon's model is one based on cost savings, and because spectrum auctions are arms-length transactions, this makes the spectrum auctions an appropriate proxy. *Id.* at 3-4.

---

[2] Defendants' other concerns regarding the use of the large dollar-value figures seen on page 4 are addressed in the Court's Supplemental Order on the Motions *in limine*. Dkt. No. 318.

As to Defendants' assertion that Dr. Bazelon cherry-picked the Auction 97[3] price, Plaintiff counters by arguing that he has consistently used the Auction 97 data throughout the years and that it provides a reliable and appropriate valuation benchmark. *Id.* at 5. Plaintiff further contends that Defendants' arguments about the externalities are misleading and irrelevant. *Id.* at 6-7.

The Court finds that, to the extent that Defendants raise valid concerns, these are best addressed through vigorous cross-examination. The Court is satisfied that the use of spectrum auction prices as a proxy for the value of Defendants' spectrum holdings is sufficiently reliable so as to not merit exclusion. As to the alleged externalities of Auction 97, Dr. Bazelon does not address these in his report and this is thus a matter best addressed through cross-examination whereby Defendants will be free to point out this allegedly cherry-picked data. Accordingly, the Motion to Strike on these bases is **DENIED**.

### D. General Reliability Arguments

In the Motion, Defendants argue that Dr. Bazelon relies on unrealistic and unsupported assumptions rendering his model flawed. Dkt. No. 186 at 11. Specifically, they allege that he assumes that "Verizon in some way benefits across the entire damages period from not using spectrum that would otherwise be used absent infringement of the asserted patents. However, Dr. Bazelon has not demonstrated that Verizon forewent buying more spectrum than it would otherwise have purchased, nor does Dr. Bazelon demonstrate how, specifically, Verizon benefits from allegedly available spectrum." *Id.* at 12. Defendants contend that instead, he merely assumes that the estimated dollar value associated with Verizon's saved spectrum, correlates to the benefits allegedly enjoyed by use of the asserted patents, but that this only works "in a world where spectrum is a perfectly liquid asset, so that Verizon could immediately and costlessly exchange

---

[3] Plaintiff refers to Auction 97 as "AWS-3." *See* Dkt. No. 216 at 5. For simplicity, the Court will continue to refer to it as Auction 97.

freed-up spectrum for its total value equivalent in cash . . . . [The] freed-up spectrum would be beneficial to Verizon only if Verizon's network could not support the extra spectrum usage without deleterious effects on the network infrastructure or on customer experience." *Id.* Defendants argue that this means Dr. Bazelon's report is methodologically unsound because (1) he supposedly never considered the real-world effects of the increased network traffic on Verizon's networks (*Id.* (citing Dkt. No. 186-4)); and (2) the reality is that Verizon has substantial excess capacity and could support an increase in data traffic that Plaintiff alleges would be the case in the absence of the accused features (*Id.* at 12-13).

Defendants further argue that "[a] court can only discern the actual market value of a patent by comparing the patented invention to its next-best alternative (an acceptable non-infringing alternative)" (*Id.* at 13 (citing *Grain Processing Corp. v. Am. Maize-Products Co.*, 185 F.3d 1341, 1351 (Fed. Cir. 1999))), but that Dr. Bazelon supposedly did not do this (*Id.* at 14).

Plaintiff responds to Defendants' first point by arguing that network capacity savings are quantifiable as a metric for damages because "[w]ireless carriers plan their networks with excess capacity precisely because demand for data traffic is growing rapidly and unpredictably." Dkt. No. 216 at 7 (citing Dkt. No. 216-2 at ¶¶ 21-30; 32). Concordantly, Plaintiff contends that, "[s]aved capacity allows carriers to defer capital expenditures, support new services (such as fixed wireless access), and preserve network flexibility" and thus, "[u]nused spectrum has economic value because it reduces the need for immediate investment in infrastructure or spectrum acquisitions." *Id.* at 8 (citing Dkt. No. 216-2 at ¶ 47).

As to Defendants' second point, Plaintiff responds that "Dr. Bazelon does not purport to address non-infringing alternatives at all. Nor should he. Dr. Bazelon is valuing the network savings attributable to the patents in suit, as measured by Dr. Wesel," and that it was "Dr. Wesel

8

[who] consider[ed] non-infringing alternatives in his opinions and addressed many of those alternatives in his testing, and f[ound] that the alternatives identified by Verizon in discovery are not viable as they are not available, acceptable, and/or non-infringing." *Id.* at 9 (citing Wesel Report at ¶¶ 2583-2648).

Dr. Bazelon has presented evidence sufficient to demonstrate that conserved network capacity is suitable as a metric for damages in his avoided-costs based model. The ability to make greater use of current capacity would allow, *inter alia*, Verizon to forgo having to acquire additional capacity and the costs associated with that.

As to Defendants' argument regarding consideration of non-infringing alternatives, the Court is satisfied that, so long as non-infringing alternatives are properly considered by a competent expert, it is immaterial (at least under the facts and circumstances of the instant case) which expert does so, provided that this remains consistent across the expert reports. Here, Dr. Bazelon used Dr. Wesel's report as an input to his own analysis. Because Dr. Wesel had already determined that no non-infringing alternatives were acceptable, and because Dr. Bazelon did not deviate from this input, Dr. Bazelon's report is acceptable in this regard.

Accordingly, the Motion to Strike is **DENIED**.

**SIGNED this 15th day of June, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE