## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| HEADWATER RESEARCH LLC, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | Case No. 2:23-cv-00352-JRG-RSP |
| VERIZON COMMUNICATIONS INC., | § | |
| CELLCO PARTNERSHIP d/b/a VERIZON | § | |
| WIRELESS, and VERIZON CORPORATE | § | |
| SERVICES GROUP, INC., | § | |
| *Defendants*. | § | |

## MEMORANDUM ORDER

Before the Court is the Motion to Strike Certain Opinions and Testimony of Defendants' Expert Kevin Jeffay, filed by Plaintiff Headwater Research LLC. **Dkt. No. 178**. For the reasons discussed below, the Motion is **GRANTED** as to Dr. Jeffay's opinions on (1) the OS-Switching NIA and (2) the iOS 7 through 10 NIA in his Invalidity and Rebuttal Reports, and otherwise **DENIED**.

## I.    BACKGROUND

On July 28, 2023 Plaintiff Headwater Research LLC filed suit against Defendants, asserting that they infringe four of its patents: U.S. Patent Nos. 8,589,541; 8,924,543; 9,198,042; and 9,215,613. Dkt. No.1 at 1. On January 29, 2025, the Parties agreed to dismiss the '543 Patent. Dkt. No. 144.

## II.    APPLICABLE LAW

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product

of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 requires a district court to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied with regard to a particular expert's proposed testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). District courts are accorded broad discretion in making Rule 702 determinations of admissibility. *Kumho Tire*, 526 U.S. at 152 ("the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"). Although the Fifth Circuit and other courts have identified various factors that the district court may consider in determining whether an expert's testimony should be admitted, the nature of the factors that are appropriate for the court to consider is dictated by the ultimate inquiry—whether the expert's testimony is sufficiently reliable and relevant to be helpful to the finder of fact and thus to warrant admission at trial. *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

Importantly, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury's consideration. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391-92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir. 2002) ("'[t]he trial court's role as gatekeeper [under Daubert] is not intended to serve as a replacement for the adversary system.' . . . Thus, while

exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits," quoting Fed. R. Evid. 702 advisory committee note). As the Supreme Court explained in *Daubert*, 509 U.S. at 596, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *See Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

### III.    ANALYSIS

Plaintiff argues that Dr. Jeffay's opinions on (1) obviousness for the '613 and '541 Patents, and (2) non-infringing alternatives ("NIAs") should be stricken. *See generally* Dkt. No. 178.

The Court will take each issue up in turn.

### A.  Obviousness Opinions

In the Motion, Plaintiff asserts that Dr. Jeffay opines that (1) the prior art does not disclose a particular limitation, but nevertheless argues that it would have been obvious, and (2) that he never alleges, nor provides evidence to support, a motivation to modify the prior art to arrive at the missing limitations. Dkt. No. 178 at 4. Plaintiff contends that, at best, a person of ordinary skill in the art ("POSITA") would have understood Dr. Jeffay's proposed modifications to be possible, but not motivated. Plaintiff argues that this is fatal to his obviousness analysis because "obviousness concerns whether a skilled artisan not only *could have made* but *would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention." *Id.* at 5 (citing *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) (emphasis in original)).

Specifically, as to claim 1 of the '541 Patent (from which the asserted claims 79 and 83 depend), Plaintiff asserts that Dr. Jeffay presents no reliable testimony that it would be obvious to

modify Android 1.6 to instruct apps to perform syncs, only for Android 1.6 to later block those syncs. *Id.* at 6. Claim 1 of the '541 Patent recites, in part, "identify a service usage activity of the wireless end-user device, . . . the service usage activity comprising one or more prospective or successful communications over a wireless network," and a "policy at least for controlling the service usage activity." '541 Patent at 110:17-29. Plaintiff contends that Dr. Jeffay alleges that these requirements are disclosed in Android 1.6 on the basis that "Android 1.6… discloses the 'service usage activity comprising one or more… *successful* communications over a wireless network.'" *Id.* (citing Dkt. No. 178-2 at ¶ 202 ("Jeffay Invalidity Report") (emphasis added by Plaintiff)). By contrast, Dr. Jeffay allegedly acknowledges that "*Android 1.6 does not apply a policy for controlling 'prospective communications… over a wireless network.*'" *Id.* (citing Jeffay Invalidity Report at ¶213 (emphasis added by Plaintiff)). Specifically, argues Plaintiff, Dr. Jeffay acknowledges that a "POSITA would understand" that a system implementing Android 1.6 "would ordinarily simply refrain from instructing an application to perform a sync if the user had disabled syncing for that application, such that the application would not attempt to sync to begin with," such that there are never any "prospective communications" under the Court's construction. *Id.* (quoting Jeffay Invalidity Report at ¶¶ 213-215).

Despite Dr. Jeffay's admission that Android 1.6 does not disclose the "prospective communications" aspect of the claim, Plaintiff point out that that Dr. Jeffay opines that "it would have been obvious to a POSITA that a service usage activity *could* also comprise 'one or more … prospective communications over [a] wireless network." *Id.* (citing Jeffay Invalidity Report at ¶ 214). In doing so, Plaintiff continues, Dr. Jeffay proposes that Android 1.6 would be modified such that (contrary to its actual operation, where it would refrain from instructing an application to perform a sync if the user had disabled syncing for that application), the system would instruct

4

applications to perform a sync even when syncing is disabled. *Id.* In this modification to the prior art, Android 1.6 would then "intercept, block, or otherwise cancel a sync attempt *after* it was initiated by an application," allegedly satisfying the "prospective communications limitation." *Id.* at 6-7 (quoting Jeffay Invalidity Report at ¶ 215 (emphasis in original)). Plaintiff asserts that this argument fails because Dr. Jeffay never alleges or adduces any evidence to support a motivation to modify Android 1.6 in the proposed manner. *Id.* at 7 (citing Jeffay Invalidity Report at ¶¶ 214-215).

Plaintiff also argues that, with respect to limitation 1[b] of claim 1, Dr. Jeffay presents no reliable testimony that it would have been obvious to "determine whether the service usage activity comprises a background activity" under his claim interpretation. Dkt. No. 178 at 8 (quoting '541 Patent at 110: 23-24). Plaintiff's argument for this substantively mirrors its argument above. S*ee id.* at 8-9.

In response, Defendants argue that Plaintiff mischaracterizes Dr. Jeffay's opinions to create the impression that he does not substantiate that there is a motivation to modify, by simply omitting Dr. Jeffay's supporting analysis from its motion. Dkt. No. 208 at 1. Specifically, they point to the following:

> a POSITA would understand that the "Auto-sync" feature, based in the SyncAdapter and SyncManager classes I describe above, would ordinarily simply refrain from instructing an application to perform a sync if the user had disabled syncing for that application, such that the application would not attempt to sync to begin with. A POSITA would further understand that the only available alternative to this goal of preventing unwanted syncing activity by applications would be to intercept, block, or otherwise cancel a sync attempt after it was initiated by an application, but before it was accomplished, or sent over the wireless network

(*Id.* at 5 (quoting Jeffay Invalidity Report at ¶ 214)), and,

> For instance, a POSITA would understand Android 1.6 uses the determination of the application state from the ActivityManager and passes this information to other classes such as SyncManager and ConnectivityManager to manage the application's

data transmission. As I have explained above, this entailed a determination that an application itself was in the "background," with the goal of preventing certain applications in the background from accessing a wireless network connection in certain circumstances. A POSITA would understand that the only alternative to the goal of preventing unwanted communications by background activities would be to look first to the communications themselves, and not to the application from which they originate. For instance, a POSITA would understand that every potential communication could be inspected to determine the application from which it originates, and a "background" status could be assigned to those communications that originate from applications currently classified as being in the "background."

*Id.* at 5-6 (quoting Jeffay Invalidity Report at ¶ 225).

Defendants argue that Dr. Jeffay, therefore, explained that for each modification, (1) there were only two ways of accomplishing what was necessary to achieve the end solution; and (2) that a POSITA would have been aware of both options and would have understood the potential tradeoffs between performance and efficiency between them. Thus, argue Defendants, in line with the Supreme Court's *KSR* decision, Dr. Jeffay did provide the necessary motivation to modify. *See id.* at 5, 6-7 (citing *KSR Intl Co. v. Teleflex Inc.*, 550 U.S. 398, 402 (2007) ("When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp.").

As Defendants correctly point out, one of the seven rationales added to the teaching-suggestion-motivation obviousness test by the Supreme Court in *KSR* was:

When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under [35 U.S.C.] § 103.

*KSR*, 550 U.S. 398, 421.

Here, although Dr. Jeffay does not explicitly say that 'a POSITA would have motivation to make the modifications at issue to Android 1.6 *because* there are a finite number of options to achieve the desired solution,' the Court is satisfied that this line of logic is sufficiently present in his report such that striking is not merited. Plaintiff will be free to address its concern through cross examination. Accordingly, the Motion to Stike on these bases is **DENIED**.

### B. Non-Infringing Alternatives Opinions

In the Motion, Plaintiff argues that the court should strike Dr. Jeffay's opinions on non-infringing alternatives because some of the NIAs were not timely disclosed, and none of them are used as inputs to any damages analysis, making them all irrelevant even if they were properly disclosed. Dkt. No. 178 at 9.

### 1. Disclosure

Regarding disclosure, Plaintiff asserts that two of Dr. Jeffay's NIA opinions—(1) regarding switching operating systems between iOS and Android[1] and (2) regarding an option to implement the versions of Background App Refresh in iOS 7 through 10[2]—were not timely disclosed. *See generally id.* at 9-11. Specifically, Plaintiff asserts that in January 2024—more than a year before Dr. Jeffay served his reports—it served Interrogatory No. 17, asking Defendants to "[d]escribe and identify any planned, potential, alleged, or implemented design-around or non-infringing alternative of any claim of the Asserted Patents." *Id.* at 10 (citing Dkt. No. 179-2 at 16). Plaintiff contends that, in response, Defendants "identified any of the systems or technologies described in the prior art as non-infringing alternatives," with no more specific identification of anything (*Id.* (citing Dkt. No. 178-4 at 74), and that it was only on December 11, 2024 and January 27, 2025 that Defendants supplemented to describe various alleged NIAs, but nowhere did Defendants

---

[1] The Court will occasionally refer to this NIA as the "OS-Switching NIA."
[2] The Court will occasionally refer to this NIA as the "iOS 7 through 10 NIA."

include any allegations about two of the alleged alternatives now found in Dr. Jeffay's reports: (i) iOS 7 through iOS 10, and (ii) switching operating systems between iOS and Android. *Id.* (citing Dkt. No. 178-4 at 74-77, 81-82; Dkt. No. 178-3 at ¶¶ 800, 801, 805 ("Jeffay Rebuttal Report" – addressing iOS 7 through iOS 10 as an alleged alternative); Jeffay Invalidity Report at ¶ 625 (addressing switching operating systems as an alleged alternative)).

Plaintiff argues that "if Defendants intended to rely upon these alleged non-infringing alternatives, it was incumbent upon them to identify them, with specificity, in response to Headwater's Interrogatory No. 17, as Defendants did with respect to other alleged alternatives." *Id.* (citing No. 178-4 at 74-77, 81-82). Their failure to do so in a timely manner, Plaintiff asserts, renders it "improper for Dr. Jeffay to address the "switching operating systems" alternative in his opening report." *Id.* at 10-11 (citing *Correct Transmission, LLC v. Nokia of Am. Corp.*, No. 2:22-cv-0343, 2024 WL 1289821 (E.D. Tex. Mar. 26, 2024)).

Defendants respond to this first argument, calling it a "groundless accusation." Dkt. No. 208 at 10. Defendants assert that both NIAs were explicitly disclosed in Defendants' interrogatory responses during fact discovery, well before Dr. Jeffay's opening expert report. *Id.* (citing Dkt. No. 208-3 at 70 ("To the extent any accused features do not infringe, are no longer accused, or are found not to infringe any of the asserted patents at trial, such features would be a non-infringing alternative to the remaining accused features.")).

With respect to the switching operating systems between iOS and Android NIA, Defendants contend that this is "exactly" how it was disclosed in Dr. Jeffay's opening report:

> *to the extent they are found not to infringe*, Android OS, Android devices, and the Accused Functionalities operating within the Android OS (*e.g.*, Data Saver) are all non-infringing alternatives to iOS, Apple devices, and the Accused Functionalities operating within iOS (*e.g.*, Background App Refresh) and iOS. The inverse is also true: iOS and Apple devices are noninfringing alternatives to Android and Android-based devices, *to the extent they are not found to infringe.*

*Id.* (quoting Jeffay Invalidity Report at ¶ 625 (emphasis added by Defendants)). "Thus," claim Defendants, "there can be no dispute that this alternative was properly disclosed." *Id.* at 11.

With respect to the iOS 7 through 10 NIA, Defendants argue that it is also expressly captured in Defendants' interrogatory response, which identifies as non-infringing alternatives any features that are "no longer accused." *Id.* (citing Dkt. No. 208-3 at 70). They go on to say that "although iOS versions 7 through 10 were not specifically called out in Dr. Jeffay's January 29, 2025 opening report, that is only because the first time Defendants learned that iOS versions 7 through 10 were no longer accused was upon receipt of the opening report of Headwater's technical expert, served the same day." *Id.* Further, after learning of this development, Dr. Jeffay specifically identified iOS versions 7 through 10 as non-infringing alternatives in his March 13, 2025, rebuttal report. *Id.* (citing Jeffay Rebuttal Report at ¶¶ 800, 797-815).

Addressing the OS-Switching NIA first, the Court finds that it was not properly disclosed. First, contrary to Defendants' bold assertion, the specific NIAs listed in paragraph 625 of Dr. Jeffay's invalidity report are not actually found in Defendants' December 11, 2024 Interrogatory responses. *See generally* Dkt. No. 208-3. The December 11 responses contain nothing more than a barebones statement (as Defendants themselves point out in their response) of: "To the extent any accused features do not infringe, are no longer accused, or are found not to infringe any of the asserted patents at trial, such features would be a non-infringing alternative to the remaining accused features." *Id.* at 70. This discloses nothing in the way of a specific NIA. Consequently, the first time the OS-Switching NIA was disclosed was in Dr. Jeffay's opening report, and *ipso facto* this report exceeds the scope of the interrogatory responses as to the OS-Switching NIA.

Without an explanation from Defendants for its failure to disclose, the Court can only conclude that this was an attempt at gamesmanship. The Court does not countenance such tactics.

Accordingly, the Motion to Strike on this basis is **GRANTED** and it is **ORDERED** that all of Dr. Jeffay's opinions regarding the OS-Switching NIA are hereby **STRICKEN** from his Invalidity and Rebuttal Reports.

Turning to the iOS 7 through 10 NIAs, as Defendants concede, this was not specifically identified[3] until it appeared in Dr. Jeffay's rebuttal report. As to Defendants' proffered excuse of not knowing that the NIA was not accused until Plaintiff served its opening expert reports, the Court is not persuaded as Defendants adduce no evidence to support this contention. The onus was on Defendants to identify their NIAs, but they did not do so with respect to the iOS 7 through 10 NIA.

Accordingly, for largely the same reasons as with the OS-Switching NIA, the Motion to Strike on this basis is **GRANTED** and it is **ORDERED** that all of Dr. Jeffay's opinions regarding the iOS 7 through 10 NIA are hereby **STRICKEN** from his Invalidity and Rebuttal Reports.

### 2. Relevance

Regarding relevance, Plaintiff asserts that all of Dr. Jeffay's NIA opinions should be excluded because they are not relied upon in Defendants' damages analysis and are, therefore, irrelevant. Dkt. No. 178 at 11 (citing *Correct Transmission*, No. 2:22-cv-0343, 2024 WL 1289821 at *4 (technical expert's opinions on non-infringing alternatives not relevant because "none of [Defendant's] experts provide any financial analysis of the impact of a noninfringing alternative to a reasonable royalty")). Plaintiff contends that, here, Defendants' damages expert, Ms. Stamm, provides no independent analysis of these alleged alternatives and does not opine as to their commercial acceptability. *Id.* at 12 (citing Dkt. No. 178-4 at ¶¶ 104-107). Plaintiff asserts that "[n]either Dr. Jeffay nor Ms. Stamm calculates the economic cost to Defendants of implementing

---

[3] For this reason, the iOS 7 through 10 NIAs suffer from the same disclosure issue as the OS-Switching NIA.

each alternative . . . and they each ignore and assume that there would be no economic consequences from removing the accused features," implying that they do provide some analysis. *Id.* (citing Dkt. No. 178-4 at ¶¶ 104-107).

Defendants respond to this second argument, calling it "flatly wrong." Dkt. No. 208 at 8. Defendants assert that Ms. Stamm did rely on the non-infringing alternatives identified by Dr. Jeffay and expressly opined that they lead to zero damages:

> The second failure of Mr. Bergman's analysis is the failure of his Income Approach to isolate only the incremental contribution over the alternatives. In short, according to Dr. Jeffay, Dr. Wesel at best quantifies all benefits conferred by restricting background applications' access to a cellular network, which has long been known in the art and is in the public domain. This conclusion would lead to damages of near zero because Headwater has not put forward any benefits properly apportioned to the asserted claims of the Asserted Patents.

*Id.* at 8-9 (citing Dkt. No. 208-7 at ¶ 12 ("Stamm Report")). Defendants also point to a later section of her report which they contend discusses various alternatives and concludes that the "reasonable royalty would be near zero" under the proper analysis. *Id.* at 9 (citing Stamm Report at ¶¶ 104-107).   In short, Defendants argue that because "Ms. Stamm expressly relied on Dr. Jeffay's non-infringing alternatives opinions in her damages analysis," there is no basis to strike them. *Id.* (differentiating the instant situation from the one in Plaintiff's cited case of *Correct Transmission*, No. 2:22-cv-0343, 2024 WL 1289821).   Having reviewed Ms. Stamm's report, the Court is satisfied that she conducts a sufficient analysis of the NIAs in her damages calculations such that exclusion is not merited. Plaintiff's concerns regarding the sparsity of Ms. Stamm's analysis are fodder for cross examination. Accordingly, the Motion to Strike Dr. Jeffay's report on this basis is **DENIED**.

**SIGNED this 15th day of June, 2025.**

11   ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE