**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

HEADWATER RESEARCH LLC,
          Plaintiff,

      v.

CELLCO PARTNERSHIP d/b/a VERIZON
WIRELESS and VERIZON CORPORATE
SERVICES GROUP, INC.,
          Defendants.

Case No. 2:23-cv-00352-JRG-RSP

**REDACTED COPY**

**<u>DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW
UNDER RULE 50(B) OR FOR A NEW TRIAL UNDER RULE 59</u>**

### TABLE OF CONTENTS

I.     STATEMENT OF ISSUES .............................................................................................1

II.    LEGAL STANDARDS ...............................................................................................1

III.   ARGUMENT ..............................................................................................................2

     A.   Verizon Is Entitled To Judgment As A Matter Of Law (Or A New Trial) On Infringement...............................................................................................................2

        1.    Headwater is precluded from arguing that the Android devices infringed the '613 Patent...............................................................................................................2

        2.    Headwater failed to prove infringement as a matter of law ......................................5

            (a)   Headwater failed to prove infringement of the '613 Patent..................................6

            (b)   Headwater failed to prove infringement of the '541 Patent..............................10

        3.    In the alternative, the verdict was against the great weight of the evidence.............13

     B.   Verizon Is Entitled To Judgment As A Matter of Law (Or A New Trial) On Damages...................................................................................................................14

        1.    Headwater failed to prove that its asserted royalty base had any relationship to the allegedly infringing conduct .....................................................................................14

        2.    Headwater failed to properly apportion damages .....................................................18

            (a)   Headwater failed to account for the disclaimed elements of the asserted claims ......................................................................................................................19

            (b)   Headwater failed to account for the contribution of others to the alleged benefits ...................................................................................................................22

        3.    Headwater failed to introduce any reliable basis for its damages opinion because its expert did not conduct testing on the relevant features............................................23

     C.   Verizon Is Entitled To A New Trial On Infringement And Damages Because The Jury Did Not Determine Whether The Android Devices Infringed Or What Percentage Of Damages Is Attributable To Android Devices................................................................26

     D.   In The Alternative, A New Trial Is Warranted Due To Headwater's Failure To Preserve Relevant Documents ................................................................................................27

IV.   CONCLUSION...........................................................................................................30

TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Apple Inc. v. Wi-LAN Inc.*,
25 F.4th 960 (Fed. Cir. 2022) ...................................................................................15, 17, 22

*Broadcom Corp. v. Emulex Corp.*,
732 F.3d 1325 (Fed. Cir. 2013)..................................................................................................4

*Caldera v. Northrop Worldwide Aircraft Servs., Inc.*,
192 F.3d 962 (Fed. Cir. 1999)....................................................................................................3

*ClearValue, Inc. v. Pearl River Polymers, Inc.*,
668 F.3d 1340 (Fed. Cir. 2012)..................................................................................................1

*Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*,
246 F.3d 1336 (Fed. Cir. 2001)................................................................................................26

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993).................................................................................................................18

*EcoFactor, Inc. v. Google LLC*,
137 F.4th 1333 (Fed. Cir. 2025) .......................................................................................18, 24

*Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*,
909 F.3d 398 (Fed. Cir. 2018)....................................................................................................9

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*,
879 F.3d 1332 (Fed. Cir. 2018)..........................................................................................20, 21

*Farese v. Scherer*,
297 F. App'x 923 (11th Cir. 2008) ..........................................................................................26

*Garreston v. Clark*,
111 U.S. 120 (1884).................................................................................................................18

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970).........................................................................................29

*Jamison Co. v. Westvaco Corp.*,
526 F.2d 922 (5th Cir. 1976) ...................................................................................................27

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012)....................................................................................................18

*Lubby Holdings LLC v. Chung*,
    11 F.4th 1355 (Fed. Cir. 2021) ....................................................................................28

*Northpoint Tech., Ltd. v. MDS Am., Inc.*,
    413 F.3d 1301 (Fed. Cir. 2005) ...................................................................................26

*Ohio Willow Wood Co. v. Alps S., LLC*,
    735 F.3d 1333 (Fed. Cir. 2013) .................................................................................3, 5

*Oiness v. Walgreen Co.*,
    88 F.3d 1025 (Fed. Cir. 1996) .....................................................................................25

*Phillips v. AWH Corp.*,
    415 F.3d 1303, 1315 (Fed. Cir. 2005) ...........................................................................5

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
    849 F.3d 1360 (Fed. Cir. 2017) ...................................................................................15

Prolitec Inc. v. ScentAir Techs. LLC,
    No. 20-984-WCB, 2024 WL 341342 (D. Del. Jan. 30, 2024) ....................................19

*Promega Corp. v. Life Techs. Corp.*,
    875 F.3d 651 (Fed. Cir. 2017) .....................................................................................18

*Rex Med., L.P. v. Intuitive Surgical, Inc.*,
    156 F.4th 1289 (Fed. Cir. 2025) .............................................................................18, 26

*Riles v. Shell Exploration & Prod. Co.*,
    298 F.3d 1302 (Fed. Cir. 2002) ...................................................................................14

*Rousseau v. Teledyne Movible Offshore, Inc.*,
    812 F.2d 971 (5th Cir. 1987) .......................................................................................13

*Seibert v. Jackson County*,
    851 F.3d 430 (5th Cir. 2017) .....................................................................................1, 29

*Shows v. Jamison Bedding, Inc.*,
    671 F.2d 927 (5th Cir. 1982) .........................................................................................2

*Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*,
    778 F.3d 1311 (Fed. Cir. 2015) .....................................................................................2

*SPEX Techs., Inc. v. W. Digital Corp.*,
    No. 8:16-CV-01799-JVS (AGRX), 2025 WL 1748190 (C.D. Cal. June 16, 2025) ....19, 22, 23

*State Farm Mut. Auto. Ins. Co. v. LogistiCare Sols., LLC*,
    751 F.3d 684 (5th Cir. 2014) .........................................................................................2

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)...............................................................................24, 26

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007)......................................................................................27

*VirnetX Inc. v. Apple Inc.*,
    No. 6:12-CV-00855-RWS, 2020 WL 3635929 (E.D. Tex. Apr. 23, 2020)............................27

*Virnetx, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014).................................................................................14, 18

*VLSI Tech. LLC v. Intel Corp.*,
    87 F.4th 1332 (Fed. Cir. 2023) ......................................................................................22

*Voice Tech Corp. v. Unified Patents, LLC*,
    110 F.4th 1331 (Fed. Cir. 2024) .......................................................................................7

*WesternGeco LLC v. ION Geophysical Corp.*,
    913 F.3d 1067 (Fed. Cir. 2019).......................................................................................21

*Wisconsin Alumni Rsch. Found. v. Apple Inc.*,
    905 F.3d 1341 (Fed. Cir. 2018).........................................................................................8

*Yarbrough v. Glow Networks*, *Inc.*,
    No. 4:19-CV-905-SDJ, 2024 WL 896747 (E.D. Tex. Mar. 1, 2024) ......................................13

**RULES:**

Fed. R. Civ. P. 50(b) ........................................................................................................1

Fed. R. Civ. P. 59(a)(1)....................................................................................................1

Fed. R. Civ. P. 59(e) .......................................................................................................1

Defendants Cellco Partnership (d/b/a Verizon Wireless) and Verizon Corporate Services Group, Inc. (collectively, "Verizon") respectfully submit this motion for judgment as a matter of law ("JMOL") under Rule 50(b) and for a new trial under Rule 59(e).  Understanding that this Court entered final judgment in favor of Verizon under the doctrine of implied waiver, *see* Dkt. 448, Verizon makes this protective motion on the issues tried to the jury and Headwater's failure to preserve relevant evidence in order to preserve all rights in the event that judgment is later disturbed.[1]

## I.    STATEMENT OF ISSUES

1.  Whether JMOL (or a new trial) is warranted on infringement of claim 1 of U.S. Patent No. 9,215,613 or claim 83 of U.S. Patent No. 8,589,541.

2.  Whether JMOL (or a new trial) is warranted on the jury's damages verdict.

3.  Whether a new trial is warranted because of Headwater's failure to preserve relevant evidence.

## II.    LEGAL STANDARDS

A court must grant a motion for JMOL against the nonmoving party if there is no "legally sufficient evidentiary basis" for "a reasonable jury . . . to find for th[at] party on that issue."  Fed. R. Civ. P. 50(a).  To withstand a motion for JMOL, "the jury's determination must be supported by substantial evidence."  *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1340, 1343 (Fed. Cir. 2012) (applying Fifth Circuit law).  Rule 59 permits courts to "grant a new trial on all or some of the issues," Fed. R. Civ. P. 59(a)(1), including when "necessary to do so to prevent an injustice," *Seibert v. Jackson County*, 851 F.3d 430, 438 (5th Cir. 2017) (quotation marks omitted).

---

[1] Verizon also preserves its arguments on the issues fully resolved before and during trial, including those issues on which the Court granted Headwater judgment as a matter of law: Headwater's standing, the eligibility of the asserted claims under Section 101, *see* Trial Tr. 1146:1-7, and Headwater's compliance with the marking statute, *see* Trial Tr. 1168:16-1169:14.

1

A court may also grant a new trial when the verdict is "against the great weight of the evidence," and in evaluating that question, the court "need not take the view of the evidence most favorable to the verdict winner." *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982).

## III.    ARGUMENT

### A.    Verizon Is Entitled To Judgment As A Matter Of Law (Or A New Trial) On Infringement.

#### 1.    Headwater is precluded from arguing that the Android devices infringed the '613 Patent.

Headwater litigated (and lost) on materially identical issues regarding the same Android features in its separate litigation against Samsung. *See Headwater Research LLC v. Samsung Elecs. Am., Inc.*, No. 2:22-cv-422-JRG, Dkt. 511 (E.D. Tex.) ("Samsung Litigation"). Issue preclusion prevents Headwater from having two bites at the apple.[2]

Issue preclusion applies when (1) an issue in a prior and subsequent litigation are identical; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the prior judgment; and (4) there is no special circumstance rendering preclusion inappropriate or unfair. *State Farm Mut. Auto. Ins. Co. v. LogistiCare Sols., LLC*, 751 F.3d 684, 689 (5th Cir. 2014); *see also Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1314 (Fed. Cir. 2015) (regional circuit law generally governs issue preclusion, but questions of issue preclusion "implicat[ing] substantive patent law issues" are controlled by Federal Circuit caselaw). At summary judgment, all parties agreed that only the first element was in dispute (whether the issues are identical). Dkt. 309 at 7.

---

[2] ███████████████████████████████████████████ As a result, a JMOL as to Android devices would resolve this case in Verizon's favor.

The relevant issues are the same. In the Samsung litigation, Headwater asserted that the same Android features infringed claim 1 of U.S. Patent No. 9,143,976. *See* Ex. 1. Samsung disagreed, arguing that the features did not "classify" whether an application is "interacting in the device display foreground with the user" and, based on that determination, "disallow[]" Internet service activities. *Id.* at col. 105:60-106:10. The dispute over these limitations was, according to Headwater, "the crux of the dispute" between the parties. Samsung Litigation, Dkt. 507 at 1162:22-1172:14; *accord id.* at 1019:11-1026:15 (Samsung's expert acknowledging this as well).

Claim 1 of the '613 Patent has a materially identical limitation, which was again the focus of the parties' dispute at this trial. Ex. 1 at col. 106:5-22. Headwater again argued that the same features "classify" whether an application "is interacting with the user in the device user interface foreground" and, based on that determination, "selectively allow or deny" Internet service activities. *See, e.g.*, Trial Tr. 433:18-24 (Wesel); Tr. 1219:18-19 (Headwater counsel calling the interaction element the "big issue" in the case). Because identical limitations were at issue, and the Samsung jury concluded that the accused Android features do not infringe, Headwater is precluded from seeking "inconsistent results" in this case involving the exact same accused features. *Caldera v. Northrop Worldwide Aircraft Servs., Inc.*, 192 F.3d 962, 970 (Fed. Cir. 1999).

Headwater pointed to only two possible distinctions between the claim at issue in the Samsung Litigation and the asserted claim of the '613 Patent; neither "materially alter[s] the question of" infringement. *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013) (rejecting the contention that a previous patent must be "identical" for issue preclusion to apply and that "the mere existence of different language" in the two claims is not dispositive where the disputed "issue" remains the same). First, the relevant '613 Patent claim covers features that "*selectively allow or* deny" internet activity, while the relevant '976 Patent claim covers features

that "disallow" (i.e. deny) internet activity.  On this basis, at summary judgment, this Court reasoned that the '613 Patent claim was broader than the '976 Patent claim because the former covers features that also "allow" internet activity.  Dkt. 309 at 8; *see* Dkt. 381.

But a product that infringes a claim even once still infringes that claim (as Headwater's counsel repeatedly argued).  *See, e.g.*, Trial Tr. 424:1-14; *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013).  The relevant limitations of claim 1 of the '976 Patent would therefore be fulfilled if an accused feature is configured to deny internet activity based on an "interacting" classification, even if the feature sometimes allows internet activity based on that classification.  Likewise, the relevant limitations of claim 1 of the '613 Patent would be infringed if an accused feature sometimes denies internet activity based on an "interacting" classification and at other times allows it.  Thus, when a service *denies* internet activity based on a qualifying "interacting" classification, it fulfills the relevant claim limitations in the exact same way.  Here, that means there is no material difference between the two critical disputed limitations in these claims because there is no dispute that the accused features *do* at least sometimes deny internet activity.  *See* Trial Tr. 433:18-24 (Wesel).  Indeed, Headwater's entire damages case is premised around the idea that the accused features deny internet access based on this classification; it does not calculate damages based on any occasions on which the accused features purportedly *allow* activity based on the "interacting" classification.  And for the occasions when the features deny internet access, there is no way to coherently conclude that they infringe claim 1 of the '613 Patent while simultaneously concluding that they do not infringe claim 1 of the '976 Patent. As a result, the jury's finding of noninfringement in the Samsung litigation precludes a finding of infringement here, too.

4

Second, the '613 Patent claim covers features that classify whether an application is interacting with the user "in the device *user interface* foreground," while the '976 Patent claim looks at interaction "in the device *display* foreground." Ex. 1 at col. 106:10-15; *id.* at col. 106:8-10 (emphases added). This slight difference in claim language does not "materially alter" the question of non-infringement. *Ohio Willow Wood*, 735 F.3d at 1342. The patents, which share the same specification, treat the terms synonymously and make no distinction between a device "display" and a device "user interface." *E.g.*, Ex. 1 at col. 66:63-65 ("In some embodiments, a user notification includes displaying (e.g., and as applicable, allowing users to provide UI [user interface] input . . . .)"); *id.* at col. 67:14-16 ("In some embodiments, a UI notification is displayed when user attempts a network capacity controlled service activity during a network busy state . . . ."); *see also id.* at col. 67:24-39. Only in rare situations can extrinsic evidence overcome intrinsic evidence; intrinsic evidence is "the single best guide to the meaning of a disputed term" and is "[u]sually . . . dispositive." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315, 1318-19 (Fed. Cir. 2005) (en banc). Headwater's contrary arguments "rely[ing] heavily on extrinsic" evidence do not overcome the intrinsic evidence that the '976 Patent treats these terms synonymously. Dkt. 309 at 9.

Because the jury found that the accused Android features did not infringe in the Samsung litigation, Headwater is precluded from obtaining an inconsistent result based on the same arguments in this case.

**2. Headwater failed to prove infringement as a matter of law.**

Headwater regardless failed to introduce sufficient evidence that the accused Android devices infringed either the '613 or '541 patents.

### (a)    Headwater failed to prove infringement of the '613 Patent.

Headwater first failed to prove infringement of the '613 Patent.  Claim 1 of the '613 Patent requires that wireless devices "classify" whether an application "is *interacting* with the user in the device user interface foreground," and selectively allow or deny internet activity based on that determination.  Ex. 1 at col. 106:5-25 (emphasis added).  The accused Android features do not work this way.  Headwater failed to prove that the alleged "foreground/background" classification relates to any alleged "interact[ion]."

To start, both parties agreed on two key aspects regarding the "interacting" limitation. First, the claim's present-tense requirement that a wireless device classify whether an application "*is* interacting with the user" requires determining whether an application is *currently* interacting with the user.  *See id.* (emphasis added); Trial Tr. 534:19-535:2 (Wesel) (agreeing that the classification is whether the application is "present tense" "interacting with the user," "[n]ot that it might do so in the future" or "in the past"); *accord* Trial Tr. 991:11-17 (Jeffay).  Second, it is not enough for the wireless device to classify whether an application is "*capable* of interacting" with the user—it must classify based on *actual* interaction.  Trial Tr. 534:25-535:8 (Wesel); *accord* Trial Tr. 991:11-17 (Jeffay).

The accused Android features do not classify applications (and thereby disallow internet activity) based on current interaction.  Instead, the accused Android features classify applications based on a foreground/background distinction.  Trial Tr. 539:1-5 (Wesel); Trial Tr. 905:16-21 (Jeffay).  The foreground/background distinction primarily classifies an application based on whether it is *visible*, not on whether it is *interacting* with a user.[3]  Trial Tr. 540:2-9 (Wesel).  As a

---

[3] An application is also treated as running in the foreground if the app is "running any foreground services."  Trial Tr. 540:2-9 (Wesel).  That is what allows music to play even if that application is not visible.  That classification is also not based on interaction, and Headwater did not pursue any interaction theory based on what counts as a "foreground service."  *See* Trial Tr. 954:15-24.

result, even in a situation where a user is undisputedly *not* interacting with an application (such as a user playing music on the phone and then leaving for a walk), the internet activity (the music) will still occur.  Trial Tr. 547:15-548:1 (Wesel); Trial Tr. 902:3-19 (Jeffay).

A co-inventor of the '613 Patent, James Lavine, explicitly agreed that a foreground/background classification was different from an interaction classification.  Trial Tr. 825:25-826:4 (Lavine).  As Mr. Lavine affirmed in a deposition played at trial, "classifying whether a user is interacting with an application is not necessarily the same thing as determining whether the application is in the foreground or background." *Id.*  Mr. Lavine had it exactly right.

Headwater's theory that a foreground classification is equivalent to an interaction classification is inconsistent with the plain and ordinary meaning of the limitation.  A person skilled in the art would recognize that claim 1 of the '613 Patent requires that a wireless device classify whether an application is "interacting with the user *in the device user interface foreground.*"  Ex. 1 at col. 106:10-12 (emphasis added).  Under Headwater's theory, the phrase "interacting with the user" is superfluous, because a foreground classification already means that the application is interacting with the user.  A person skilled in the art would not read the claims to introduce this redundancy.  *See Voice Tech Corp. v. Unified Patents, LLC*, 110 F.4th 1331, 1342-43 (Fed. Cir. 2024).

Headwater's arguments in favor of its mistaken understanding miss the mark.  Headwater primarily argued that a "background" classification means that "no user interaction is" possible because the device does "not provid[e] the user interface" necessary for a user to interact with it.  Trial Tr. 1124:2-15 (Headwater closing).  And it conversely argued that the foreground state, given its visibility to the user, is the state "in which the app interacts with the user."  Trial Tr. 1219:25-1220:24.  In other words, Headwater primarily argued that these classifications revealed whether

an application is *capable* of interacting with the user.  These arguments are squarely contradicted by Headwater's expert's explicit concession that whether an application is *capable* of interaction is different than whether the application *is* interacting with the user.  Trial Tr. 534:25-535:8 (Wesel).

Such arguments also otherwise stretch claim 1's language far beyond its "plain and ordinary meaning." *Wisconsin Alumni Rsch. Found. v. Apple Inc.*, 905 F.3d 1341, 1348 (Fed. Cir. 2018).  Claim 1 requires actual "classification[s]" based on interaction, while the above argument (at most) alleges that a foreground/background classification *implicitly* reveals information relevant to interaction.  Even assuming the latter is true, that would not mean that the Android features are making "classifications" based on interaction.  A patent classifying trees does not classify based on the color green, even if many of the trees also happen to be green.

Headwater's additional arguments equally fall short.  First, Headwater argued that certain sub-classifications (known as "process states") determining whether an application is treated as "background" or "foreground" themselves classify based on interaction.  *See* Trial Tr. 539:6-12 (Wesel) (explaining process states).  Dr. Wesel argued that the "top" state (the state that occurs for the "app that is on the front of the display"), constitutes classification based on interaction because a user has to "press[] [a] button" to bring an app to the front.  Trial Tr. 426:5-12 (Wesel).  But just because an interaction may *bring* an application to the foreground (i.e. the display) does not mean that Android features *classify* the application as foreground based on the existence of interaction.  As Dr. Wesel himself agreed, an application remains in the top state even hours after the user has ceased interacting with it—it is the *display*, and not the interaction, that the Android features classify.  Trial Tr. 547:15-548:1 (Wesel).  At most, Dr. Wesel could only point to Android documents saying that the top state "is the state *in which* the app interacts with the user."  Trial Tr.

592:10-13 (Wesel) (emphasis added).  But that again merely refers to the *capability* of interaction, which Dr. Wesel himself conceded is insufficient.  *See supra* p. 6.  The top state does not classify based on interaction.[4]

Headwater also made feature-specific arguments on App Standby and Doze Mode.  To be clear, if only *some* features infringed claim 1, then damages must be limited to benefits from only those features.  *See Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 419 (Fed. Cir. 2018) (holding that "patent damages are limited to those adequate to compensate for the infringement" and reversing damages award based on sale of non-infringing products) (citation omitted); *see also infra* pp. 23-26 (explaining that damages cannot be based on the App Standby and Doze Mode features for other reasons).  Regardless, these feature-specific arguments equally lack merit.  Dr. Wesel theorized that App Standby and Doze Mode classify based on present interaction because the modes are triggered when a user does not use an application for a long period of time.  *See* Trial Tr. 425:12-19, 426:15-427:11 (Wesel); *see also* Trial Tr. 874:18-875:16 (Jeffay) (explaining Doze Mode and App Standby).  But these are classifications based on a period of *past* interaction, they are not classifications based on *present* interaction.  *See supra* p. 6.  The claim only covers the latter.  *Id.*

Finally and independently, Headwater failed to show infringement of claim 1 because the claim requires an interface that allows a user to be able to "augment" the relevant policy on and off for one set of applications but not a second set. Ex. 1 at col. 106:1-4.  For the accused Android

---

[4] Headwater's counsel suggested that the top state relied on interaction because one part of the Android source code designated the top state with an "interaction" function.  Trial Tr. 952:7-953:18; 1221:2-9; Ex. 2 at lines 5561-5562.  Headwater's own infringement expert did not rely on that as evidence in over 200 pages of testimony for a reason.  *See* Trial Tr. 386:4-609:5 (Wesel).  The question is how the source code *works*, not the label it uses, and the code focuses solely on whether an app is in the foreground or background.  *See* Trial Tr. 982:7-24 (Jeffay).

features, however, the user interfaces do not enable interaction with one group of apps but not another; you can only toggle the features for each app individually, or for all apps at once.  Trial Tr. 553:8-15 (Wesel); *see also* Trial Tr. 912:7-10 (Jeffay).  This limitation is therefore not met as well.

**(b)     Headwater failed to prove infringement of the '541 Patent.**

Headwater also failed to prove infringement as a matter of law of claim 83 of the '541 Patent.  Headwater failed to show that Verizon infringes the limitations of the independent claim 1, or the additional limitation in claim 83.

Claim 1.  Both parties agreed that claim 1 of the '541 Patent requires a device to (1) identify a service usage activity; (2) determine whether the service usage activity comprises a background activity; (3) determine a policy to control the service usage activity; and (4) apply the policy to the service usage activity.  Ex. 3 at col. 110:14-31; Trial Tr. 501:4-503:6 (Wesel); Trial Tr. 877:11-22 (Jeffay).

The accused Android features do not work this way.  They do not identify any "service usage activity," much less make a determination regarding one and apply a policy accordingly. Instead the Android features operate by identifying *applications*.  Trial Tr. 882:9-883:4 (Jeffay). Applications seeking to use background activity must request permission from the Android network manager.  Trial Tr. 530:6-14 (Wesel); Trial Tr. 889:10-18 (Jeffay).  That network manager then either allows all background activity or none at all depending on a user's designation for the particular app.  Trial Tr. 532:1-8 (Wesel); Trial Tr. 883:25-884:7 (Jeffay).  It is the identification of the application—and nothing else—that determines whether background activity is allowed. Because (as Dr. Wesel conceded) an application is not a "service usage activity," Android features creating policies based solely on applications do not infringe claim 1.  *See* Trial Tr. 501:4-14

10

(Wesel); *accord* Trial Tr. 879:12-17 (Jeffay) (explaining that service usage activities are not applications but rather communications "generated *by* an app") (emphasis added).

Because the above analysis is straightforward, Headwater at trial adopted a highly counterintuitive theory of infringement. Headwater appears[5] to have argued that all of the background network activities that *would* have occurred but for the denial of permission were themselves service usage activities, because the claim defines service usage activities to include "prospective . . . communications over a wireless network." *See* Ex. 3 at col. 110:21-23; Trial Tr. 1126:22-1127:10 (Headwater counsel saying the service usage activity is "prospective" "background network activity" controlled by the network manager); Trial Tr. 449:3-9 (Wesel) (explaining that the "service usage activity is a background network activity"); Trial Tr. 530:25-531:23 (Wesel) (arguing that a request for network permission is a request for a "prospective activity"). The theory would be that these nonexistent communications are "prospective" communications.

That theory fails twice over. Initially, all parties agreed that a wireless communication is never even *started* when permission is denied. Trial Tr. 530:3-532:4 (Wassel); Trial Tr. 889:22-891:10 (Jeffay). A nonexistent communication is not a "prospective" communication. *See* Dkt. 140 (court construing "prospective communications" as "communication(s)" that are successful or "may become successful unless prevented by" a policy); Trial Tr. 891:7-10 (Jaffey) (explaining "[t]here are no network communications . . . so there can be no service usage activity"). But

---

[5] Headwater never cleanly articulated its theory of what constitutes the "service usage activity." And notably, Dr. Wesel explicitly rejected the primary argument from his report, which was that the service usage activity was the application's request for permission to the Android network manager. *See* Trial Tr. 530:25-531:2 (Wesel); Dkt. 176-7 ¶¶ 331, 526 (Wesel Expert Report) (identifying this as his theory).

11

regardless, the Android features would not be *identifying* non-existent communications and then *determining* whether those non-existent communications are background activities. *See supra* p. 10 (elements of claim); *see also* Trial Tr. 1222:6-8 (Headwater counsel disclaiming the similar idea that it had to show that Android features "evaluate[] each communication one by one"). As the undisputed facts show, that's not how the Android features work. The Android features simply stop all communications based on which application seeks permission. *Supra* p. 10. It is the identity of the application, not a particular "service usage activity," that controls.

Claim 83. Even assuming the Android features met all the limitations of claim 1 (and they do not), they would not infringe the additional limitation from the dependent claim 83 requiring that the relevant policy "assist in intercepting, modifying, blocking, removing, injecting, swapping, or replacing an application interface message." Ex. 3 at col. 117:32-35. An "application interface message" includes the "messages that are sent by the app to" the Android network manager to ask for a connection, as well as the response to it. Trial Tr. 200:14-18 (Raleigh); Trial Tr. 597:4-12 (Wesel). And this Court has defined "interception" to mean "receiving a message directed to or meant for another." Dkt. 311 at 16 (R&R); Dkt. 382 (adopting R&R).

The accused Android features do not engage in any of the activities required by this limitation with respect to an application interface message. *See* Trial Tr. 893:14-895:25 (Jeffay). The first application interface message (the request for permission to connect) arrives right at its intended recipient (the Android network manager) every time. *Id.* That message reaches no other entity and functions exactly as it is supposed to function. *Id.* Similarly, the second application interface message (the response to the request) arrives right at its intended recipient (the application) every time. *Id.* That message also reaches no other entity and functions exactly as it is supposed to function. *Id.*

12

Dr. Wesel opined that when the Android network manager denies permission to an application, that counts as the policy "modifying," "listen[ing] in," "swapping [out]," or "blocking" the responding message. Tr. 467:18-468:4 (Wesel). It does none of those things. That statement presumes that the default response is that communications are allowed, and that Android features therefore intercept and change that message to be a denial. But there is no default response; it just depends on whether or not the user has enabled the application for the relevant feature. *See supra* p. 10. "[O]ne of the possibilities is [that] the request is going to be denied." Trial Tr. 895:11-15 (Jeffay). As Verizon explained at trial, if an "employee . . . ask[s] for time off next week, and the manager looks at the schedule and says, no," the manager's message cannot be said to have been "intercepted or swapped or interjected or anything like that." Trial Tr. 895:19-25. The same logic applies here.

### 3. In the alternative, the verdict was against the great weight of the evidence.

At minimum, the jury's verdict on infringement was against the great weight of the evidence. It is "well-settled" that "a verdict can be against the great weight of the evidence" even if a court ultimately finds there is "substantial evidence to support it." *See Rousseau v. Teledyne Movible Offshore, Inc.*, 812 F.2d 971, 972 (5th Cir. 1987) (per curiam) (quotation marks and citation omitted). A "new trial can be appropriate even when a judgment [notwithstanding the verdict] is not." *Id.* Should this Court decline to order a judgment notwithstanding the verdict, it should therefore order a new trial because the evidence of infringement was "dwarfed by the evidence" of non-infringement. *Yarbrough v. Glow Networks*, *Inc.*, No. 4:19-CV-905-SDJ, 2024 WL 896747, at *26 (E.D. Tex. Mar. 1, 2024). That is particularly true where, as here, Headwater's infringement theory at trial deviated significantly from its pretrial theory, *supra* p. 11 n.5, and where the jury's verdict does not even permit the Court to determine whether the jury found

13

infringement or damages as to the only accused products remaining in the case. *See infra* pp. 26-27.

        **B.**        **Verizon Is Entitled To Judgment As A Matter of Law (Or A New Trial) On Damages.**

        **1.**        **Headwater failed to prove that its asserted royalty base had any relationship to the allegedly infringing conduct.**

There is a fundamental flaw in Headwater's damages theory. Headwater based its calculation on the supposed *savings* to Verizon from reduced data usage. But Verizon is in the business of selling data, not conserving it. Headwater utterly failed to link its theory of cost savings to the infringing activity, as Federal Circuit precedent requires.

A "patentee must take care to seek only those damages attributable to the infringing features" of the accused technology. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014). Where, as here, a plaintiff accuses only some "component[s] of a multi-component product," the general rule is that damages must be based on the value of only the infringing components. *Id.* This usually requires starting from "the smallest salable patent-practicing unit" to determine the royalty base. *Id.* at 1327 (quotation marks omitted). In this case, Headwater chose the value of Verizon's wireless spectrum as its royalty base. *See* Trial Tr. 695:6-19 (Bergman). But wireless spectrum is not accused of infringing *at all*. Headwater has failed to explain why it is incapable of calculating damages under the ordinary, smallest salable patent-practicing unit method, and its damages case fails on that basis alone.

In any event, when a party relies on the supposed benefit to the infringer for its damages theory, a party must provide an evidence-based connection for its theory of cost savings. *See Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002). "The economic relationship between the patented method and non-infringing alternative methods, of necessity, would limit the hypothetical negotiation." *Id.* As the Federal Circuit has explained, "the difference

in production costs between infringing and non-infringing products effectively cap[s] the reasonable royalty award." *Id.* (quotation marks omitted).  Moreover, like any damages analysis, a cost-savings theory cannot rest on unexplained assumptions or pure expert speculation.  *See Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 973 (Fed. Cir. 2022) (rejecting damages opinion "untethered to the facts of this case").  Instead, it must attempt to quantify the actual, incremental cost to the defendant generated by use of an available non-infringing alternative.  *See Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017) (affirming damages award based on cost of building alternative wireless network where "uncontroverted evidence" was introduced that the defendant "would have chosen to build its own . . . network in the absence of a license").

Headwater's theory does not comply with these precedents because it relies on the *entire* amount of data supposedly conserved on users' devices by the invention over the relevant damages period without any evidence that Verizon actually benefitted from that reduced data usage.  *See, e.g.*, Trial Tr. 481:12-19 (Wesel).  Instead, Headwater's witnesses simply assumed that Verizon would have needed to purchase the exact amount of additional spectrum allegedly conserved on end-user devices.  *See* Trial Tr. 704:4-10 (Bergman); Ex. 4 at 18; Ex. 5 at 24.  As Dr. Bazelon conceded on cross-examination, he did "not [do] an analysis" of "whether Verizon already made the spectrum purchases . . . needed to adequately cover for capacity . . . for the life of these patents."  Trial Tr. 719:12-18 (Bazelon).  And he certainly did not purport to analyze whether, if Verizon needed to purchase additional spectrum as a result of disabling the infringing features, it would have purchased an amount corresponding to the *exact amount* of data conserved.  *See id.*; Trial Tr. 1155:6-1156:6.

Undisputed evidence contradicts Headwater's theory.  Verizon has had more than enough capacity to cover any increase attributable to disabling the accused features throughout the damages period.  Trial Tr. 1046:17-25 (Stamm) ("Verizon's not going to pay for more capacity because it has plenty of available capacity."); Ex. 6 at 18 (showing Verizon consistently has significant excess capacity even during "Busy Hour Usage"); Tr. 748:5-10 (Mr. Rice testifying that "on average, there's 4 percent of the [Verizon] network that is being used," meaning "96 percent" is excess capacity).  Moreover, it is undisputed that Verizon was already growing its capacity due to other factors, and that there are plenty of ways to increase capacity without purchasing spectrum.  *See, e.g.*, Trial Tr. 866:17-18 (Hazlett) (testifying the "capacity crunch" predating the invention "was alleviated by just building out networks and acquiring more spectrum"); Trial Tr. 1006:14-22 (Hazlett) (capacity can be increased by reusing spectrum or adding new towers and other infrastructure); Trial Tr. 1029:2-12 (Hazlett) (Verizon also adds capacity "with upgrades in the technologies" as well).  Headwater produced zero evidence to suggest that Verizon would have had any marginal need to grow its network beyond the current baseline if it had been required to disable the allegedly infringing features on mobile devices.

When pressed about the failure to analyze whether Verizon would have needed additional capacity, Dr. Bazelon stated that he did not "believe [that] in 2016 Verizon had enough capacity to satisfy all the way through 2029."  Trial Tr. 719:17-18 (Bazelon).  That "belief" cannot support the jury's verdict for two separate reasons.  First, it lacks any foundation in evidence because Dr. Bazelon admits he did not analyze the issue.  *See also* Trial Tr. 720:18-23 (Bazelon) (answering "I don't know" to "whether Defendants already made the spectrum purchases" they would need).  Second, it does not actually address the pertinent issue, which is whether Verizon *would* have purchased or otherwise created sufficient additional capacity for unrelated reasons to cover any

16

delta over the lifetime of the patents.  It is simply not *relevant* whether Verizon already had all the capacity it would already need until 2029 by the start of the claimed damages period in 2016.  For the same reason, Headwater cannot rely on evidence that Verizon has continued to purchase spectrum after 2016 to support its theory.  Trial Tr. 769:8-20 (Rice); Trial Tr. 1018:17-1019:3 (Hazlett); Ex. 6 at 18.  The issue is not whether Verizon purchased spectrum, but whether it would have been required to purchase *more than it did* as a result of disabling the allegedly infringing features.

None of the other various adjustments that Headwater's experts made to their calculation purported to address this gap in the evidence.  For instance, Dr. Bazelon applied a "funnel" to narrow the total amount of spectrum supposedly at issue, but that "funnel" had nothing to do with determining whether Verizon *needed* additional spectrum to accommodate the supposed additional usage.  *See* Trial Tr. 625:24-627:20 (Bazelon); Ex. 4 at 15.  Instead, it was directed entirely to correcting for devices that did not even allegedly infringe and adjusting the time period to account for the claimed damages period.  *See id.*  And although Dr. Bergman converted his pricing of the spectrum to a "per unit" price—suggesting that the savings had some relationship to the accused devices—that price was generated by simply dividing the total "savings" that Dr. Bergman calculated by the total number of devices sold during the claimed damages period.  That number is, if anything, even *more* divorced from reality because Headwater's damages theory had nothing to do with the value or price of the accused devices.

In short, Headwater *assumed* that Verizon would have had to purchase the entire amount of additional spectrum consumed.  *See* Trial Tr. 1041:22-25 (Stamm).  That assumption is not only "untethered" from the trial record, *Apple*, 25 F.4th at 973, but it is directly contradicted by undisputed testimony from multiple witnesses.  Under these circumstances, the Court should grant

17

Verizon JMOL of no damages.  *See, e.g.*, *Rex Med., L.P. v. Intuitive Surgical, Inc.*, 156 F.4th 1289, 1301 (Fed. Cir. 2025) (affirming JMOL of zero damages where patentee failed to introduce "evidence from which a jury could reasonably determine damages for infringement . . . without speculation").  Despite being fully aware of this issue from the *Daubert* motion practice, Headwater offered no other theory of damages at trial.  There is no basis to grant it a mulligan at this late stage.

At minimum, a new trial on damages is warranted.  Headwater should not have been permitted to introduce a damages theory that had no foundation in fact.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993); *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1345 (Fed. Cir. 2025) (en banc).  Its reliance on spectrum prejudiced Verizon by "skew[ing] the damages horizon," *Virnetx*, 767 F.3d at 1327 (quotation marks omitted), allowing Headwater to begin from eye-popping numbers—over $700 million, Trial Tr. 630:25-631:1—that made its ultimate ask seem far more reasonable than it was.

### 2.  Headwater failed to properly apportion damages.

Headwater's damages case lacked any evidence that would have allowed the jury to properly apportion damages, as required by law.

"The burden of proving damages falls on the patentee, and the patentee must show his damages by evidence."  *Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 660 (Fed. Cir. 2017) (alterations adopted and citations omitted).  "[T]he patentee must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative."  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting *Garreston v. Clark*, 111 U.S. 120, 121 (1884)).

Headwater failed to apportion in two different ways: (1) it failed to account for the elements of the invention that are dedicated to the public and have also been found invalid; and (2) it failed to account for the contributions of others to the alleged benefits.  As a result, Verizon is entitled to a JMOL of no damages or, at minimum, a new trial at which Headwater is required to carry its burden to properly apportion its damages.  *See, e.g.*, *SPEX Techs., Inc. v. W. Digital Corp.*, No. 8:16-CV-01799-JVS (AGRX), 2025 WL 1748190, at *11 (C.D. Cal. June 16, 2025) (granting defendant's Rule 50(b) motion as to damages because plaintiff failed to present evidence accounting for the value of non-claimed features).

### (a)    Headwater failed to account for the disclaimed elements of the asserted claims.

For both asserted claims, Headwater failed to apportion the incremental value of the patented invention beyond the prior art.  Specifically, the core elements for controlling background activity are recited in claim 1 of the '541 Patent, which Headwater has dedicated to the public.  Ex. 7 at 1; Trial Tr. 932:10-933:10 (Jeffay).  Thus, claim 1 of the '541 Patent is free for anyone to use without having to pay Headwater a cent.  Moreover, the PTAB has also found that all elements of claim 1 have been disclosed by prior art in the final written decision issued in Defendants' IPRs. Ex. 8 at 32 (ordering that claims 2-23, 26, 41-60, 63, 64, 91-152, 155-171 of the '541 patent, all of which depend on the sole independent claim 1 of the '541 Patent, are invalid).[6]  The asserted claim 83 of the '541 Patent incorporates all elements of claim 1, and thus damages "must be confined to the value added by [this] claim, excluding the value associated with [claim 1]." *Prolitec Inc. v. ScentAir Techs. LLC*, No. 20-984-WCB, 2024 WL 341342, at *2 (D. Del. Jan. 30, 2024) (Bryson, J.); *General Access Sol'ns, Ltd. v. Cellco P'ship*, No. 2:22-CV-394-JRG (E.D.

---

[6] The deadline to appeal the PTAB's decision has expired, and Headwater did not appeal.  *See* IPR2024-00942, IPR2024-00943.

Tex.), Trial Tr. 1269:10-17 (instructing jury that damages must be based "solely" on value of dependent claims since, as here, independent claims were in public domain).

At trial, Headwater made no effort to apportion out the value attributable to claim 1, as the Federal Circuit requires. *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) ("[T]he patent owner must apportion or separate the damages between the patented improvement and the conventional components of the multicomponent product."). Headwater relied on Dr. Bergman to prove damages, who in turn relied entirely on Dr. Wesel for the incremental benefits that Verizon supposedly gets from the asserted patents; Dr. Bergman performed no such analysis himself. Trial Tr. 703:24-704:10, 705:2-706:2, 713:8-714:20 (Bergman). Dr. Wesel agreed at trial that "[a]nyone is free to do everything that's in claim 1" since it is disclaimed by Headwater. Trial Tr. 560:23-561:4 (Wesel). He then admitted that he did not compare the benefit of practicing claim 83 of the '541 Patent with the benefit of practicing just claim 1. Trial Tr. 562:7-10 (Wesel).[7]

In this case, that failure was a critical omission. Headwater's damages theory was based on the total amount of data supposedly conserved by the accused features on infringing devices. *See supra* pp. 14-15. But the disclaimed independent claim is what recites the vast majority of functionality associated with this alleged benefit—including the device itself, the determination of whether a "service usage activity comprises a background activity," and a "policy . . . for controlling the service usage activity" based on that determination. '541 Patent col. 110:14-31. The only thing claim 83 adds is that the "policy" from claim 1 must involve "intercepting,

---

[7] Headwater also disclaimed dependent claims 24-25, 27-40, 61-62, 65-78, 80-82, 84-90, 153-154, and 172-174 of the '541 Patent. Ex. 6 at 1. Dr. Wesel further admitted that he did not compare the benefit of practicing claim 83 to the benefit of practicing these other claims that are free to use. Trial Tr. 562:15-18 (Wesel).

modifying, blocking, removing, injecting, swapping, or replacing" an application interface message." '541 Patent col. 117:32-35. Nothing in Headwater's trial evidence remotely suggests that the *entire* claimed benefit of conserved data can be attributed to the addition of this marginal limitation.

Likewise, for claim 1 of the '613 Patent, Headwater was required to exclude the data savings that can be achieved using prior art methods—such as that recited in the disclaimed and invalid claim 1 of the '541 Patent—and measure only the incremental benefit achieved using the specific approach recited in the asserted claim. *Exmark*, 879 F.3d at 1348. This requirement was even more critical given Headwater's position that the technologies of the '541 Patent and the '613 Patent were overlapping, such that it is entitled to the same damages calculation (with only an adjustment for differences in the alleged damages periods) regardless of whether both patents are found infringed or only the '613 Patent is found to be infringed. *See* Trial Tr. at 680:13-20 (Bergman); Trial Tr. 1221:14-17 (Headwater closing). If the independent claim of the '613 Patent yielded benefits that were *different* from those articulated in the independent claim of the '541 Patent, then Headwater would have been obligated to apportion its damages separately for each patent, *see, e.g.*, *WesternGeco LLC v. ION Geophysical Corp.*, 913 F.3d 1067, 1075 (Fed. Cir. 2019)—something it did not even try to do. *See* Trial Tr. 562:19-22 (Wesel) (Dr. Wesel admitting that he did not compare the benefit of practicing the '613 Patent with the benefit of practicing claim 1 of the '541 Patent).

Indeed, during the ongoing *ex parte* reexamination of the '613 Patent, Headwater argued that only certain elements of claim 1 are novel—in particular, Headwater focuses on the specific criteria that the claimed devices use to determine whether to permit internet access, not the more fundamental ability to adopt a user-augmentable policy that is able to regulate internet access. *See*

21

Ex. 9 at 6.  Notably, Headwater *admitted* that the prior art "may involve decisions to allow or deny Internet access based on policies, some of which may be augmented by users." *Id.* at 9.  Headwater did not offer any damages theory tied to the incremental value of the claim elements that supposedly constitute an advance beyond these admitted contributions of the prior art.  This omission exacerbated the apportionment problem especially given the overlap between the two asserted patents and that a large part of the claimed invention in the '541 Patent has been dedicated to the public.

In short, Headwater offered the jury *no basis* to separate the conventional and unconventional elements of the claims.  As a result, Verizon is entitled to JMOL of no damages or, at minimum, a new trial where the jury is properly instructed as to these aspects of its apportionment requirement.  *See SPEX Techs.*, 2025 WL 1748190, at *11.

### (b)    Headwater failed to account for the contribution of others to the alleged benefits.

Headwater also failed to account for the value others contributed to the accused features—specifically, the contribution of Google to the accused Android features and the contributions of Apple to the accused Apple features.[8]  *See VLSI Tech. LLC v. Intel Corp.,* 87 F.4th 1332, 1345 (Fed. Cir. 2023) ("Any reasonable royalty must seek to measure the value of the patented technology—it must be 'apportioned' to that value—by separating out and excluding other value in economic products or practices." (alteration adopted)); *Apple Inc.*, 25 F.4th at 976 (upholding the district court's grant of a new damages trial after determining that the patentee's expert conflated the benefit of the specific patented technology with the benefits of the overall technology).

---

[8] Verizon continues to challenge the basis for the damages as to the Apple devices because the jury form makes it impossible to determine whether the ultimate damages figure reflects the calculations for Apple or Android devices. *See infra* pp. 26-27.

22

Headwater did not design the accused Android features; Google did. *See* Trial Tr. 710:10-15 (Bergman); Trial Tr. 930:24-931:14 (Jeffay).  Google engineers like Mr. Yamasani designed the source code for those features, not Headwater. Mr. Bergman failed to analyze Google's contributions, including the contributions of Google's patents, to the accused Android features. Trial Tr. 710:10-21 (Bergman).  Likewise, it was Apple, not Headwater that designed the accused Background App Refresh feature.  Trial Tr. 709:16-25 (Bergman); Trial Tr. 931:15-932:8 (Jeffay). At trial, Dr. Bergman agreed that if the Background App Refresh feature provides value, at least some of that is due to what Apple contributed, including contribution by Apple engineers who wrote the source code for Background App Refresh.  Trial Tr. 709:16-25 (Bergman).  Dr. Bergman also admitted that he did not analyze Apple's patents over Background App Refresh to see how much they contributed to the value of this feature.  Trial Tr. 710:1-9 (Bergman).  His omission means that the jury has no way of determining whether the data savings that Headwater claims are attributable to the asserted claims are in fact attributable in whole or in part to Google and Apple's innovative work.  Because Headwater offered the jury no basis to separate the value of its claimed invention from the non-infringing components of the accused features, Verizon is entitled to JMOL of no damages or, at minimum, a new trial.  *See SPEX Techs.*, 2025 WL 1748190, at *11.

### 3. Headwater failed to introduce any reliable basis for its damages opinion because its expert did not conduct testing on the relevant features.

Headwater also failed to introduce any reliable basis for its damages opinion as to the accused Android features.  That is because the key number at the root of its calculation—Dr. Wesel's estimated data savings—tested only one Android feature and wrongly presumed that two other features saved data in the same way.[9]  That baseless presumption was contrary to the only

---

[9] Dr. Wesel did not include the fourth accused Android feature (Data Saver Mode) in his damages calculations.  Ex. 10 at 1608 ¶ 2426.

evidence on the issue and resulted in a dramatically inflated damages calculation.  *See EcoFactor*, 137 F.4th at 1345 (damages opinion unreliable where "fundamental premise" "was not based on sufficient facts or data," requiring new trial on damages); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) (similar, and noting that a damages opinion "[b]eginning from a fundamentally flawed premise . . . results in a fundamentally flawed conclusion").

In calculating his estimated data savings of the four accused Android features, Dr. Wesel tested only one feature: Power Saving Mode.  Trial Tr. 483:1-15, 566:7-9 (Wesel).  Power Saving Mode turns off all background data for selected applications.  Trial Tr. 413:22-414:1-7 (Wesel); Trial Tr. 873:18-20 (Jeffay).  Dr. Wesel calculated how much data an average user saved per application with Power Saving Mode enabled.  Trial Tr. 482:20-483:22 (Wesel).  Dr. Wesel then presumed that two other features (App Standby and Doze Mode) saved an identical amount of data per application when in use, and based on how often each mode was activated, opined that collective usage of all four features saved the average user about 3.5% of total data used.  Trial Tr. 484:9-488:19 (Wesel).

That presumption was incorrect.  As Dr. Wesel conceded, the two largest features, together comprising over 80% of his damages calculation (App Standby and Doze Mode) "work completely differently than Power Saving[]" Mode. Trial Tr. 566:14-21 (Wesel).  Specifically, those two features do *not* eliminate usage of background data.  Instead, they only *defer* the usage of background data, and allow applications to utilize background data in limited, spread-out windows. *See* Trial Tr. 426:19-22 (Wesel) (agreeing Doze Mode "*defer[s]* background CPU and network activity") (emphasis added); Trial Tr. 451:1-3 (Wesel) (same); Trial Tr. 461:14-17 (Wesel) (same for both Doze Mode and App Standby); Trial Tr. 566:24-567:5 (Wesel) (same for both); Trial Tr. 567:24-568:1 (explicitly agreeing that Doze Mode "just takes what would ordinarily be done"

24

continually and later "does it all at the same time"); Trial Tr. 874:4-875:16 (Jeffay) (explaining both in detail).  Defendants' expert explained that these features therefore saved Verizon *no* data because the same amount of background data is used at these later points.[10]  Trial Tr. 875:17-876:2, 917:6-13 (Jeffay).  Dr. Wesel did no testing to rebut Defendants' expert testimony.  Trial Tr. 566:14-16 (Wesel).

This error dramatically inflated Headwater's damages calculation.  Because App Standby and Doze Mode are the only features permanently on by default, they constituted over 80% of Dr. Wesel's estimated data savings.  *See* Trial Tr. 568:19- 569:12 (Wesel) (saying those two features amounted to 2.9% of his estimated 3.5% total savings).  In other words, the vast majority of the proposed data savings rested on the false assumption that these two features saved data just as Power Saving Mode did.  That flawed 3.5% figure was in turn the bedrock number underpinning Headwater's experts' opinions that Verizon saved $773 million in subsequent capacity, Trial Tr. 613:6-16, 630:25-631:1, 638:5-8 (Bazelon), that therefore should result in $193 million in damages, Trial Tr. 688:16-690:18, 698:24-699:2 (Bergman).

In response, Dr. Wesel stated he did not know how to test these features because they were on by default.  Trial Tr. 582:16-23.  Defendants' expert explained how Dr. Wesel could "easily" have tested them in (again unrebutted) testimony.  Trial Tr. 918:4-24.  But regardless, difficulty in testing does not give an expert license to make unreliable assumptions that contradict record evidence.  *E.g., Oiness v. Walgreen Co.*, 88 F.3d 1025, 1031-32 (Fed. Cir. 1996) (even where ordinary damages calculations are "complicated," expert cannot proffer an opinion where its

---

[10] Although App Standby and Doze Mode do not reduce data, they are important features because consolidating the usage of background data to confined periods saves significant battery life.  Trial Tr. 874:23-875:3, 917:9-10 (Jeffay)**.**  Headwater did not seek damages from Verizon on any theory related to improved battery life.  *See* Trial Tr. 1227:13-1229:2 (Headwater requesting damages based solely on alleged data savings).

"entire premise is flawed").  The "burden of proving . . . damages" remains on "the patentee." *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1353 (Fed. Cir. 2001).

Because Headwater therefore failed to provide any "evidence from which a jury could reasonably determine damages for infringement . . . without speculation," this Court should order JMOL of zero damages.  *See Rex Med.*, 156 F.4th at 1301.  At minimum, Dr. Wesel's "fundamentally flawed premise" resulting in a "fundamentally flawed conclusion" requires a new trial on damages.  *Uniloc USA,* 632 F.3d at 1317.

### C.    Verizon Is Entitled To A New Trial On Infringement And Damages Because The Jury Did Not Determine Whether The Android Devices Infringed Or What Percentage Of Damages Is Attributable To Android Devices.

Verizon is also entitled to a new trial on both infringement and damages because there is no basis to determine whether the jury actually found that the only remaining accused devices in the case—Pixel devices running the Android operating system—infringed, or what percentage of damages are attributable to those devices.  Over Verizon's objection, *see* Tr. 1180:24-1181:18, the jury verdict did not determine whether Android or Apple features ultimately infringed the patents, nor did it apportion damages between Android devices and Apple devices. Dkt. 420 at 4, 7.  That distinction matters because under the parties' partial settlement Headwater "no longer pursue[s]" infringement claims against Apple products. Dkt. 439 at 2.  Where infringement claims are no longer legally viable, and the jury's verdict does not make clear whether it relied on an impermissible basis, the general rule is to require a new trial to resolve the ambiguity.  *See, e.g.*, *Northpoint Tech., Ltd. v. MDS Am., Inc.*, 413 F.3d 1301, 1311 (Fed. Cir. 2005); *Farese v. Scherer*, 297 F. App'x 923, 927-928 (11th Cir. 2008) (per curiam) (vacating "entire judgment" where court could not determine if verdict rested on grounds precluded by prior settlement agreement).  The same rule applies when "the jury rendered a single verdict on damages, without breaking down the

26

damages attributable to each." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1310 (Fed. Cir. 2007).

There is no reason to depart from the general rule here.  This Court has explained that there is an "exceedingly high bar" that must be met to "depart[] from the normal rule." *VirnetX Inc. v. Apple Inc.*, No. 6:12-CV-00855-RWS, 2020 WL 3635929, at *6 (E.D. Tex. Apr. 23, 2020), *vacated on other grounds*, No. 2021-1672, 2023 WL 2770074 (Fed. Cir. Mar. 31, 2023).  Verizon objected to the decision not to require separate findings for Android.  Trial Tr. 1180:24-1181:18.  And both Verizon and Headwater analyzed Apple and Android products separately throughout the whole trial.  *See, e.g.*, Trial Tr. 461:2-14 (Wessel); 910:25-912:19 (Jeffay).[11]  After the partial settlement, however, it is unclear whether the jury actually found that the only products for which there remains a legally viable theory of infringement.  Moreover, the Fifth Circuit has recognized that even if the Court concludes that a new trial is warranted only *as to damages*, that would still require a retrial of all issues where, as here, it is not possible to assess "the basis for liability" in the prior verdict.  *Jamison Co. v. Westvaco Corp.*, 526 F.2d 922, 935 (5th Cir. 1976).  The ambiguity inherent in the jury's verdict warrants a new trial.

**D.**     **In The Alternative, A New Trial Is Warranted Due To Headwater's Failure To Preserve Relevant Documents.**

If the Court does not grant JMOL to Verizon, it should grant a new trial due to the prejudice resulting from Headwater's failure to preserve relevant documents, including ItsOn's source code, software, and related technical documentation that allegedly embodied Headwater's IP (the "ItsOn ESI").  These materials were critical to the resolution of key issues in the case, and their absence

---

[11] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████

27

materially impacted Verizon's ability to present its case.  A new trial is warranted at which Headwater would be subject to the sanctions that Verizon previously requested for this failure. *See* Dkt. 164.

As discussed in Verizon's motion for sanctions, Headwater was obligated to preserve the ItsOn ESI but failed to do so.  *See generally id.*  Contrary to the determination in the Memorandum Order denying Verizon's motion for sanctions, Headwater possessed not only the right and authority but also the practical ability to control ItsOn's assets, including the ItsOn ESI.  This Court's opinion on Verizon's equitable defenses confirmed as much, finding that Headwater and ItsOn were "functionally [] a single entity under the control of Dr. Raleigh."  Dkt. 447 at 2 n.3. Due to Headwater's failure to take reasonable steps to preserve the ItsOn ESI, those materials are gone forever and cannot be restored or replaced.  Dkt. 164 at 9-10.

The trial record confirms that Verizon was severely prejudiced by the pre-trial denial of the motion for sanctions, especially on the issue of damages.  For example, at trial, Headwater repeatedly told the jury that it is "undisputed" that the '613 Patent was never implemented by ItsOn and that "if [they] find infringement of the '613 Patent, that covers *all of the damages*."  *See* Trial Tr. 944:5-7, 1111:2-8, 1221:14-17 (emphasis added).  But this position contradicts Headwater's original interrogatory response and testimony of Headwater's inventors.  There is a strong chance that the ItsOn ESI, particularly the source code, would have allowed Verizon to introduce evidence that that products practicing the '613 Patent were not marked, which in turn would have prevented Headwater from meeting its burden to prove that it had complied with the marking statute such that it was entitled to pre-suit damages for that patent.  *See* Dkt. 164 at 13-14; *see Lubby Holdings LLC v. Chung*, 11 F.4th 1355, 1359 (Fed. Cir. 2021) (explaining burdens of production and proof for marking statute).  If, on the other hand, ItsOn did not practice claim 1 of the '613 Patent, then

ItsOn's prototype product would have constituted a non-infringing alternative. Headwater's inconsistent positions—combined with its failure to preserve the ItsOn ESI—unfairly prevented Verizon from presenting this evidence to the jury, which could have supported a reduction in damages.

Additionally, under *Georgia Pacific* factors 8 and 10, when the patent has been used in product before and how successful it was is pertinent to the determination of the amount of a reasonable royalty. *Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified sub nom. Georgia-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971). The fact that ItsOn's implementation of the patented technology caused significant problems would be relevant to Verizon's willingness to pay for a license and how much it would pay during a hypothetical negotiation. Nevertheless, at trial, Headwater dismissed references to ItsOn as a mere distraction, downplaying their relevance and suggesting they were insignificant to the issues. *See* Trial Tr. 1221:14-17, 1230:7-10. Headwater even solicited testimony from its technical expert that he has not seen any evidence "by Verizon or anyone else that ItsOn practiced specifically claim 83 of the '541 Patent." *Id.* at 588:17-20. Verizon would have been able to provide evidence showing that ItsOn practiced the asserted claims if the ItsOn ESI had been preserved. Such evidence would have been highly relevant to the jury's assessment of appropriate damages.

Because Verizon was severely prejudiced due to Headwater's failure to reserve relevant documents, a new trial is warranted at which Headwater should be subject to the sanctions that Verizon requested in its pretrial motion on this issue. *See Seibert*, 851 F.3d at 438 ("A district court has discretion to grant a new trial under Rule 59(a) of the Federal Rules of Civil Procedure when it is necessary to do so to prevent an injustice." (quotation marks omitted)).

29

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant Verizon JMOL on the issues of infringement and damages, or, in the alternative, grant a new trial.

Dated:  May 21, 2026

Respectfully submitted,

/s/ *Celine Crowson*
Celine Crowson (D.C. Bar No. 0436549A)
Reedy Swanson (D.C. Bar No. 230795)
**HOGAN LOVELLS US LLP**
555 13th St NW,
Washington, D.C. 20004
Telephone: 202-637-5600
celine.crowson@hoganlovells.com
reedy.swanson@hoganlovells.com

Tej Singh (California Bar No. 286547)
Yi Zhang (California Bar No. 342823)
Kyle Xu (California Bar No. 344100)
**HOGAN LOVELLS US LLP**
4 Embarcadero Center Suite 3500
San Francisco, CA 94111
Telephone: 415-374-2300
tej.singh@hoganlovells.com
yi.zhang@hoganlovells.com
kyle.xu@hoganlovells.com

Deron R. Dacus (TX Bar No. 00790553)
**THE DACUS FIRM, P.C**.
821 ESE Loop 323, Suite 430
Tyler, Texas 75701
Telephone: (903) 705-1117
Email: ddacus@dacusfirm.com
*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via electronic mail on May 21, 2026.

/s/ *Celine Crowson*
Celine Crowson

**CERTIFICATE OF AUTHORIZATION TO SEAL**

I hereby certify that pursuant to the protective order of the above-captioned case, this motion and exhibits hereto contain confidential information.  Accordingly, this document is to be filed under seal.

/s/ *Celine Crowson*
Celine Crowson